STATE of Minnesota, Respondent,

v.

Charles Ellice MEMS, Appellant.

No. A04–1608.

Supreme Court of Minnesota.

Jan. 26, 2006.

---

Charles Ellice Mems, Stillwater, MN, pro se.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Appellant Charles Ellice Mems was found guilty by a district court jury of first-degree premeditated murder in the shooting death of his former girlfriend and was sentenced to life in prison. Appellant's appeal from the judgment is based principally on the claims that he was mistakenly identified and was deprived of a fair trial. We affirm.

Appellant and coworker Cindy Peterson dated for approximately six years. Peterson broke off the relationship in late 2001 or early 2002. She told a close friend that appellant was very upset and did not want the relationship to end. In January 2002, Peterson began dating another coworker, Ignacio Villordo–Luna. Thereafter, appellant approached Villordo–Luna at work and told him to "leave [Peterson] alone." Appellant routinely harassed Peterson at work. Peterson reported the harassment to the employer's human resources department. In one reported incident, Peterson said that appellant had confronted her outside the break room and told her that she was "not the kind of employee that [the employer] would want" and that he was "going to get [her]." Appellant also engaged in stalking behavior, loitering around her house in the early morning hours and following her in his car.

Meanwhile, Peterson and Villordo–Luna became engaged and planned to marry in Las Vegas on October 26, 2002. During the week before the couple was to leave for Las Vegas, appellant approached Peterson at work twice, telling her each time that she would never marry "the Mexican." On October 23, 2002, Peterson left her house at approximately 9:30 p.m. to go to work. As she was about to enter her car, she was shot three times: once crosswise through her buttocks, and twice in the head and neck. She died the next day from her wounds.

A neighbor heard the shots, immediately went outside and saw a person approximately six feet two inches tall, dressed in a long, olive-green trenchcoat and a tight hat, standing by the open door of Peterson's car. The person turned and began walking away from the scene without looking back. The neighbor followed this person for several blocks. At about this time a pedestrian crossed paths with the man in the olive-green trenchcoat at 26th and Madison. The neighbor continued following the man down Madison to a vehicle parked south of the intersection of Madison and Lowry. The neighbor described the vehicle as a dark green SUV, probably a Ford Explorer based on the length. The neighbor saw the person enter the car, drive to the intersection of Madison and Lowry, and turn right onto Lowry. The neighbor ran after the SUV a short distance to try to obtain the license plate number but was unsuccessful. However, he told an officer in a passing police car that the suspect had just driven towards Central Avenue in a dark SUV.

Meanwhile, at approximately 9:40 p.m., off-duty truck driver Richard Miller was listening to a police scanner as he drove along Johnson towards the intersection of Johnson and Lowry. He had heard about the shooting and the police alert for a dark

SUV in the area. About a quarter of a block away from the intersection of Johnson and Lowry, he saw a dark Ford Explorer going east on Lowry run a red light at the intersection. Suspecting the Explorer was the one the police were seeking, Miller followed it. During the ensuing chase the Explorer took sudden U-turns, ran red lights, and went up to speeds of 80 miles per hour. Miller noted the license plate number, which he wrote on the palm of his hand and communicated to the police through a 911 operator via cell phone. The police initially heard the license plate number as BGS–615 and that appeared to be confirmed by Miller during the 911 call. However, when the police called him back later, Miller stated the license plate number as BJS–615. At one point during the chase, the two vehicles came to a complete stop next to each other in a well-lit area. Miller finally lost the Explorer when it took a U-turn on Snelling, driving over a median.

Appellant was the registered owner of a dark blue Ford Explorer with license plate number BJS–615. Based upon information gathered from those in the vicinity of the shooting and those who had encountered the suspect, police officers went to appellant's house, arriving between 10:15 and 10:20 p.m., and set up surveillance. At 12:45 a.m. on October 24, appellant arrived in a dark blue Ford Explorer with no license plates and entered the house. When appellant left the house at approximately 1:20 a.m., the officers arrested him.

At approximately 6:30 a.m. on October 25, 2002, police investigators showed truck driver Miller a six-person photographic lineup that included a photograph of appellant. The investigators asked Miller if he recognized anyone. Miller identified appellant as the person who most resembled the driver of the SUV he had followed.

Appellant was indicted by grand jury for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2004), first-degree domestic assault murder, Minn.Stat. § 609.185(a)(6), and second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2004). In the year and a half before trial, he dismissed two attorneys and caused the withdrawal of a third attorney by the submission of various complaints against him, alleging criminal and unethical conduct. Appellant was then found eligible for public defender services. He subsequently sought to discharge his public defenders for the purpose of seeking new counsel but was advised that no further continuances would be granted. He chose to remain with the public defenders rather than proceed to trial pro se. Before trial, the district court dismissed the first-degree domestic abuse homicide count and excluded all references to domestic abuse during voir dire and preliminary jury instructions.

The jury found appellant guilty of first-degree premeditated murder and second-degree murder on May 26, 2004. The district court entered judgment of conviction for first-degree premeditated murder; and after finding that appellant had been previously convicted of a heinous crime involving force or coercion, the court sentenced appellant to life in prison without parole. Proceeding pro se on appeal,[1] appellant claims that the evidence of identification was insufficient to support the verdict and that he was deprived of a fair trial by the improper admission of evidence, prosecutorial misconduct, judicial bias and other irregularities at trial.

## I.

■ Appellant's primary contention is that his conviction should be reversed out-

right because the evidence in support of his identification as the person who committed the charged crime rests on inconsistent and/or perjured testimony. He points to inconsistencies in the testimony of investigating officers regarding the October 25, 2002, photographic-lineup display; inconsistencies in testimony of witnesses as to the color and license plate number of the suspect vehicle; and inconsistencies in the testimony of those witnesses who encountered the suspect shortly after the shooting. He argues that the truck driver's out-of-court identification of him as the driver of the Ford Explorer the truck driver had chased was tainted by media coverage of the shooting, and that the truck driver's in-court identification testimony was fabricated. He argues that the forensic scientist's testimony was "deliberately false" and that other witnesses were "untruthful." He suggests that the evidence shows that truckdriver Miller committed the crime, stole appellant's license plates and called 911 to frame appellant for the crime.

■ Assessing the credibility of a witness and the weight to be given a witness's testimony is exclusively the province of the jury. *State v. Bliss*, 457 N.W.2d 385, 390 (Minn.1990). The jury is free to accept part and reject part of a witness's testimony. *State v. Johnson*, 568 N.W.2d 426, 436 (Minn.1997). Inconsistencies or conflicts between one witness and another do not necessarily constitute false testimony or serve as a basis for reversal. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985). "It will be noted that in reviewing the sufficiency of the evidence we do not try the facts anew. Our responsibility extends no further than to make a painstaking review of the record to determine whether

---

**1.** After briefs were filed by both appellant's attorney and the state in this direct appeal, appellant discharged his attorney. We grant-

ed his request to proceed pro se and to substitute his own brief for that of his attorney.

the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt is sufficient to permit the jury to reach that conclusion." *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). Here, the state's evidence of appellant's identity, offered by witnesses in the vicinity of the shooting and those who chased the suspect, in conjunction with and corroborated by the testimony of investigating officers, together with evidence of threats and a strained relationship, was legally sufficient to support the verdict.

## II.

▌ *Improper Admission of Evidence.* Appellant asserts that the truck driver's out-of-court identification of him as the driver of the Ford Explorer should have been suppressed and that the in-court identification should not have been permitted. The test for determining whether suppression of eyewitness identification testimony is required on due process grounds is whether the identification procedures used by the police were so unnecessarily suggestive as to create a " 'very substantial likelihood of irreparable misidentification.' " *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Here, the district court found, and our independent review of the record confirms, that the photographic display was not impermissibly suggestive.[2]

▌ Appellant asserts that the admission of evidence obtained during the execution of search warrants for his house and vehicles was improper because the affidavits in support of the warrants contained factual misrepresentations. "Misrepresentations invalidate a warrant when they are

(1) deliberately or recklessly made, and (2) material to establishing probable cause, meaning probable cause could likely not be established without them." *State v. Jones,* 678 N.W.2d 1, 12 (2004) (citing *State v. Moore,* 438 N.W.2d 101, 105 (Minn.1989)). The record reflects that the misrepresentations alleged by appellant, largely information gathered in 911 calls, were neither intentional nor reckless and in any event not material as the affidavits otherwise provided probable cause for the search warrants. Appellant also asserts that the searches were invalid because the officers named in the warrants were not present at the inception of the respective searches as required by Minn.Stat. § 626.13 (2004). The district court found, and the record reflects, that the search warrants were properly executed.

▌ *Prosecutorial Misconduct.* Appellant asserts that the prosecutor committed misconduct in closing argument by misstating the evidence by arguing the 911 operator did not clearly hear and record the license number the truck driver called in and that the truck driver showered before the police photographed the license plate number he had written on his hand. Counsel has the right to analyze and explain the evidence, and to argue all proper inferences to be drawn from the evidence. *State v. Wahlberg,* 296 N.W.2d 408, 419 (Minn.1980). The record reflects that the prosecutor did not mischaracterize the evidence and that the statement about the 911 call was a fair and reasonable inference that could be drawn from the evidence. The prosecutor did not commit misconduct in closing argument.

▌ *Judicial Bias.* Appellant asserts judicial bias in the official transcription of

---

**2.** Appellant also maintains that the truck driver's identification from the photographic display was tainted by media coverage and fabri-

cated; but as already discussed, that is a matter of witness credibility and not of suggestive identification procedures.

the proceedings and the conduct of trial. He claims that one of the court reporters deliberately mistranscribed portions of the proceedings, intentionally changed other portions from one transcript to the next, and omitted at least one portion of the examination of one of the investigating officers. This claim centers on a July 7, 2003 pretrial hearing that was transcribed pretrial and, for reasons not apparent from the record, transcribed a second time on appeal after the conviction. Both transcripts reflect that the hearing primarily concerned making a record of appellant's dismissal of his second privately-retained attorney on the eve of trial. Rather than evidencing a deliberate mistranscription, the differences between the two transcripts of the same hearing are minor clerical deviations of the sort which likely would occur if the transcription were done twice.[3]

 Appellant further claims that the district court was not impartial, as demonstrated by rulings adverse to him. There is the presumption that a judge has discharged his or her judicial duties properly. *McKenzie v. State*, 583 N.W.2d 744, 747 (Minn.1998). Prior adverse rulings by a judge, without more, do not constitute judicial bias. *Cf. United States v. Anderson*, 433 F.2d 856, 860 (8th Cir.1970) (holding that prior rulings do not establish bias, even if erroneous, for purposes of recusal). The record reflects that the district court carefully considered motions made by both sides; and the court ruled in favor of appellant on some very important motions. Appellant was not denied his right to a fair trial before an impartial judge.

 *Other Irregularities at Trial.* Appellant asserts a violation of his First Amendment rights by restrictions on the manner of communicating with the court. He alleges that when he raised his hand to be acknowledged by the court, the court told him to communicate his concerns to the court through his attorneys. Trial courts have a grave responsibility in overseeing and regulating courtroom conduct and procedure during trials, including criminal trials. *See* Minn. R. Gen. Prac. 2.02. A trial court must maintain order in the courtroom. Code of Judicial Conduct, Canon 3.A(3). "Because an appellate court cannot glean from a transcript the atmosphere or particular threats to order and decorum in the courtroom, trial courts are vested with broad discretion in deciding matters of courtroom procedure." *State v. Lindsey*, 632 N.W.2d 652, 658 (Minn.2001). Here, the record reflects that the district court properly exercised that discretion.

 Appellant argues that he was deprived of legal counsel of his choice. The Sixth Amendment of the United States Constitution and article I, section 6 of the Minnesota Constitution provide that a criminal defendant has the right to the assistance of counsel for his defense, which "includes a fair opportunity to secure counsel of his choice." *State v. Vance*, 254 N.W.2d 353, 358 (Minn.1977). Appellant discharged two privately retained attorneys and caused a third attorney to withdraw before the appointment of public defenders, all of which necessitated multiple

---

**3.** Parties may seek correction or modification of the record pursuant to Minn. R. Civ.App. P. 110.05 (stating that "[i]f anything material to either party is omitted from the record by error or accident or is misstated in it, the parties by stipulation, or the trial court, either before or after the record is transmitted to the appellate court, or the appellate court, on motion by a party or on its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be approved and transmitted.").

continuances and significant delay in trial. Under these circumstances, appellant's right to counsel of his choice had been vindicated as he had been granted ample time to secure privately-retained counsel.

■■■ Appellant claims that his attorneys refused to call certain witnesses to testify on his behalf, in violation of the Sixth Amendment right to compulsory process. What evidence to present and which witnesses to call at trial are tactical decisions properly left to the discretion of trial counsel. *State v. Doppler,* 590 N.W.2d 627, 633 (Minn.1999). "[T]he lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval." *Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

■■ Appellant argues that jury sequestration during deliberation put undue pressure on the jury and coerced the verdict. Jury sequestration during deliberation is mandatory unless the defendant and prosecution consent otherwise. Minn. R.Crim. P. 26.03, subd. 5(1) (stating "[w]ith the consent of the defendant and the prosecution, the court, in its discretion, may allow the jurors to separate over night during deliberation."). Here, the prosecution did not consent to jury separation during deliberation, requesting instead jury sequestration. "In this state, it is a long-standing precedent that sequestration of jurors during deliberation is necessary to protect defendants against even the possibility of outside influence or jury tampering." *State v. Sanders,* 376 N.W.2d 196, 207 (Minn.1985) (Wahl, J., concurring specially).

■■■ Appellant further argues that the district court engaged in communications with the deliberating jury in his absence, in violation of his right to be present at all critical stages of the trial. "[T]he general rule is that a trial court judge should have no communication with the jury after deliberations begin unless that communication is in open court and in the defendant's presence." *State v. Sessions,* 621 N.W.2d 751, 755–56 (Minn.2001). Here, the record reflects that the sole substantive communication between the district court and the jury after deliberations began was done in open court and in appellant's presence.

■■■ Finally, appellant asserts that his privilege against compelled self-incrimination was violated because the *Miranda* warning given prior to custodial interrogation was inadequate. Statements made by a suspect during custodial interrogation are generally inadmissible unless the suspect is first given a *Miranda* warning. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* warnings protect a defendant's Fifth Amendment privilege against compulsory self-incrimination. *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Even assuming appellant's police statement was obtained in violation of *Miranda,* there was no Fifth Amendment violation where his statement was not admitted at trial. *See Chavez v. Martinez,* 538 U.S. 760, 767, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (stating that "[s]tatements compelled by police interrogations of course may not be used against a defendant at trial * * * but it is not until their use in a criminal case that a violation of the Self–Incrimination Clause occurs.").

In summary, we conclude that the evidence of appellant's identity was legally sufficient to support the verdict and that he received a fair trial.

Affirmed.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this matter.