**STATE of Minnesota, Respondent,**

v.

**Eric Maurice WRIGHT, Appellant.**

**No. A05–1747.**

Supreme Court of Minnesota.

Aug. 17, 2006.

have on sentencing in future cases similar to Holmes'.

John M. Stuart, State Public Defender, Sharon E. Jacks, Assistant Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul MN; and Janelle Prokopec Kendall, Stearns County Attorney, St. Cloud, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Following a jury trial in Stearns County District Court, appellant Eric Maurice Wright was convicted of first-degree premeditated murder and sentenced to life in prison without the possibility of release in connection with the stabbing death of 82-year–old Raymond Wander. On appeal from the judgment, Wright asserts he was denied a fair trial by the erroneous admission of *Spreigl* evidence and prosecutorial misconduct; and he also asserts constitutional error in sentencing. By pro se supplemental brief, Wright makes additional claims of ineffective assistance of counsel. We affirm.

Wander lived alone in the family home in Elrosa, Minnesota. He was meticulous in maintaining the home on his own, believing that everything had its place. Wander had a checking account for bills but would otherwise pay for items with cash that he kept in a two-drawer filing cabinet in his main-floor bedroom. As part of his daily routine, Wander would retrieve his newspaper from his mailbox and his mail from the post office. He had children living in Elrosa and Richfield who were in contact with him on an "almost" daily basis. His daughter, Marjorie, would call him nearly every night around 9:00 p.m. so as not to interrupt his favorite TV show. She last spoke with her father on March 23, 2004.

Appellant Wright lived in Richfield with Wander's daughter, Mary Jane. Wright was also the primary driver of Mary Jane's 1995 Toyota Camry. He was on good terms with Mary Jane's father, playing cards with him and helping with yard work in the fall, and he had spent the night in the Wander family home roughly half a dozen times. Although Wright had struggled with substance abuse during his relationship with Mary Jane, he was working at Cub Foods and going to college.

On March 23, 2004, Wright was in the midst of what would eventually be a 2– or 3–day drug binge. In the afternoon of the 23rd, Wright and another man in a red and white Indiana jacket purchased a TV at Target and traded it for five 20–dollar rocks of cocaine. At about 6:20 p.m.,

Wright and the man in the Indiana jacket arrived at Wright's and Mary Jane's home. Wright lied that he was in trouble and needed money. Although Mary Jane thought Wright had probably been drinking and doing drugs, she drove the men in the 1995 Toyota Camry to an ATM where she withdrew $200 and gave the money to Wright. When they returned home, Wright said he had to drive to Brooklyn Center. Following an argument, Mary Jane threw the car keys at Wright who then left with the man in the Indiana jacket. Wright bought crack cocaine two more times that night, the second occurring sometime between 11:30 p.m. and midnight. He was alone both times.

On March 24, 2004, Wright returned home between 5:15 a.m. and 5:30 a.m., as Mary Jane was getting ready to get up for work. He said he was tired and needed a place to lie down. He ironed her pants and made her coffee. He was "antsy" and his hands were shaking. Wright called Mary Jane at work around 8:00 a.m., told her that he loved her and that he needed to get help. Wright borrowed money from neighbors and coworkers and purchased crack cocaine. He seemed nervous and agitated; and he looked "kind of ragged."

On March 25, 2004, at around 5:15 a.m. or 5:30 a.m., the Durand, Wisconsin police department called Mary Jane. Wright had been hospitalized in Durand following suicide attempts and arrangements needed to be made for the return of the Toyota Camry to Richfield. After Wright was transferred to a hospital in Eau Claire, Wisconsin authorities called again, telling Mary Jane that Wright was concerned about her father's safety and asking that she confirm that he was all right. When Mary Jane was unable to reach her father by phone, she contacted family members to check on him. At 1:08 p.m., Lorraine Wander, Wander's daughter-in-law, called 911 and reported finding Wander dead in the basement of his home. Responding officers found Wander lying face down in a pool of blood. His hands had been tied behind his back with an electrical cord that had been cut from a nearby battery charger, and his body had several knife wounds, including a gaping wound to the neck. He was fully clothed and was wearing one slipper.

The officers found no signs of forced entry; the home was well-kept, neat, and everything seemed to be in order, although a single slipper matching the one on the body was found in the middle of the living-room floor. The police canvassed the neighborhood, spoke to a family member, found newspapers dated March 24 and 25 still in the mailbox, and mail for the same dates still at the post office. An elderly neighbor reported hearing people arguing in the street around 2:30 a.m. on March 24 and seeing Wander standing in his doorway.

In processing the crime scene, investigators found a bent steak knife with a piece missing from the handle on Wander's bed, a blood smear on the bed sheet, and a bank bag and wallet in the bedroom filing cabinet. No paper currency was found in the house. In the kitchen, investigators found a knife block with an empty slot and a drop of blood on the kitchen floor near the top of the basement stairway. In the basement, they found the missing piece from the handle of the knife found in the bedroom. Investigators also noted boxes of liquor bottles but did not check them further as they seemed to be in place; nothing appeared to have been "riffled [sic] through." Outside, they found four cigarette butts between the residence and the driveway, on the driveway, and in the corner of the garage; two were unfiltered Camel cigarettes, and the other two were also unfiltered, but not identifiable by

brand. Wright smoked unfiltered Camel cigarettes.

Meanwhile, some four hours into the investigation of the Wander homicide, Wisconsin authorities notified the Stearns County Sheriff's Department that Wright had made comments to hospital staff about having a vague recollection of pulling a knife from Wander's back. A BCA agent traveled to Wisconsin to interview Wright that night. Following a *Miranda* warning and waiver, Wright said that on March 24, after being up all night smoking crack, he arrived home around "5 something in the morning." He said that after Mary Jane left for work, he smoked crack, became despondent because of his addiction, purchased some liquor, and tried to commit suicide by carbon monoxide poisoning in the garage, but he woke up. He then borrowed money, purchased crack, and eventually ended up in Mounds Park where he again tried to commit suicide, this time by slicing his wrists with a box cutter. He said he awoke to find himself driving, eventually ending up in a hospital in Durand and then being transferred to a hospital in Eau Claire. He said that while at the Eau Claire hospital, he "just felt something that [he] could see [himself] pulling the knife out" of Wander, being "angry at somebody," and having "three guys with [him]." He said that because he did not know if this was a dream, he wanted Mary Jane to check on Wander. He indicated that when using drugs, he had trouble recalling what happened. At the end of the interview, he asked if Wander was all right. When told that Wander was dead, Wright became upset.

In subsequent statements to the authorities and letters to Mary Jane, Wright admitted driving up to Wander's home on March 24, arriving around 2:00 a.m. Wright told the authorities that he had three other men in his car and told them to "stay down" and wait for him. He did not know their names, although one of the men had been with him earlier at Target and on the drive to the ATM. He was not sure why he "ended up there," guessing that he was "so stoned out of [his] mind" that he "probably suggested going up there to borrow the money." He said that after Wander gave him some money, he and Wander went down to the basement to get some liquor and that one of the men from the car followed them. He said he thought he looked through liquor boxes for Captain Morgan, grabbed a bottle of some "fruity type" liquor, turned around and saw Wander lying on the floor with a knife in his back and one of the men from the car standing over Wander. He said he pulled the knife out of Wander, remembered feeling anger but could not recall thinking about Wander. He could not recall much about the trip back to Minneapolis. He said that all four of them were drinking, doing crack, and smoking cigarettes and marijuana that night. Wright denied killing Wander and denied knowledge of what happened but nevertheless felt responsible for Wander's death and expressed deep remorse.

The Minnesota Bureau of Criminal Apprehension (BCA) analyzed the evidence collected from the crime scene and determined that the DNA profile of the blood on the knife matched Wander's DNA profile and that the DNA profile of the blood on the kitchen floor and bed sheet matched Wright's DNA profile. One of the cigarette butts found on the driveway of the Elrosa residence had DNA material matching Wright's DNA profile; biological material was not found on the other three cigarette butts. The clothing Wright wore on the night of the homicide had no blood on it. The police located the person in the red and white Indiana jacket who was with Wright at the Target store and later at the ATM but found no evidence other than

Wright's statements to connect that man to the crime scene.

Wright was indicted by grand jury for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2004), several counts of first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2004), and second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2004). At trial, in addition to the physical evidence and forensic analysis of the evidence collected at the crime scene, Wright's statements to the authorities and letters to Mary Jane were admitted in the state's case-in-chief. There also was evidence that when the 1995 Toyota Camry was still in Durand, Wisconsin, the local police executed a search warrant on the vehicle because of comments Wright had made indicating the possibility that a dead body was in the trunk. The police opened the trunk and observed a glove with a red substance suggestive of blood. At that point, the police impounded the vehicle, sealed it with evidence tape, and turned it over to the Minnesota BCA. With the exception of the driver's area, the BCA found the vehicle fairly clean and well maintained, and there was nothing in the back seat compartment to indicate that anyone had recently been in that area. The glove found in the trunk tested negative for blood.

The medical examiner testified that Wander's body had contusions on the arms, wrists, and left shoulder, all occurring within 24 hours of death. There was bruising on the back of the right hand consistent with punching something, also occurring close to the time of death.

There were four stab wounds on the chest and abdominal region; three stab wounds on the back; and multiple incised wounds on the neck, which severed the windpipe, causing death. There was little internal bleeding, indicating that all of the stab wounds occurred in a short period of time. The stab wounds on the back occurred last; and one of those wounds hit the vertebral column, suggesting that the knife blade bent on impact. The BCA forensic scientist testified that there was no blood behind Wander's hips and that blood spatter across the doorway indicated that he was on his knees when the fatal wound was inflicted. Over objection of defense counsel, the state was allowed to admit evidence of a prior assault conviction for purposes of identity. Wright's decision to exercise his Fifth Amendment right not to testify was placed on the record. The jury found Wright guilty as charged. The district court entered judgment of conviction for first-degree premeditated murder and imposed a life prison term without the possibility of release. This appeal followed.

## I.

■ Wright initially challenges the admission of other-crimes evidence. In 1991, Wright was charged with attempted second-degree murder and first-degree criminal sexual conduct. He ultimately entered a guilty plea to first-degree assault and was sentenced to a 180–month prison term. During the trial for the current offense, the factual-basis inquiry portion of the 1991 plea-hearing transcript was read to the jury.[1] At the plea hear-

---

**1.** The state presented a certified copy of the judgment of the 1991 conviction and sought to establish the underlying acts either through the complaint or guilty plea transcript. To mitigate possible prejudice, the court allowed a limited portion of the guilty plea inquiry. Prior misconduct may be proved by convic-

tions; but a judgment of conviction "is hearsay if offered to prove the underlying act for the purpose of showing intent and the like under FRE 404(b), since it is not the fact of conviction that counts, but the fact that the person convicted committed the acts." 1 Christopher B. Mueller & Laird C. Kirkpat-

ing, Wright acknowledged that after days of extensive drug use, on March 25, 1991 at around 12:30–12:50 a.m., he went to the apartment of a long-time female acquaintance; that they got into an argument about drugs; that he was "not quite clear as to what happened" but that he did recall hitting her and acknowledged that she was stabbed with a knife, resulting in lacerations on her neck and puncture wounds on her back.

 We review the admission of other-crimes evidence for an abuse of discretion. *State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991). Evidence of other crimes, wrongs, or acts is inadmissible to prove the character of the accused in order to show that the individual acted in conformity therewith on a particular occasion. Minn. R. Evid. 404(b). But other-crimes or *Spreigl* evidence may be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.; State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965). Admission of *Spreigl* evidence is evaluated under a five-step process requiring that:

(1) the state must give notice * * *; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential for prejudice to the defendant.

*State v. Ness,* 707 N.W.2d 676, 686 (Minn. 2006). The fifth step incorporates a consideration of the level of need the state has for the *Spreigl* evidence, though the state's need for the evidence is not a separate requirement for admission. *Id.* at 690. Here, Wright challenges application of the fourth and fifth steps, requiring that the *Spreigl* evidence be relevant and that the probative value of the evidence not be outweighed by its potential for prejudice.

 The state argued that the *Spreigl* incident was relevant to show the identity of the individual who actually committed the homicide. *Spreigl* evidence may be relevant and material to show the identity of the perpetrator if identity is at issue and if there is a sufficient "time, place, or modus operandi nexus" between the charged offense and the *Spreigl* offense. *State v. Blom,* 682 N.W.2d 578, 612 (Minn.2004). "The past crime does not have to be a 'signature' crime, as long as the crime was sufficiently similar to the incident at issue before the jury." *Id.* However, "if the prior crime is simply of the same generic type as the charged of-

---

rick, *Federal Evidence* § 109, 616 & n. 3 (2d ed.1994); *see State v. Crocker,* 409 N.W.2d 840, 844 (Minn.1987) (citing first edition of Treatise). And evidence of "arrests or charges should not itself be admitted to prove the underlying acts under FRE 404(b), since neither is sufficiently probative of the basic question whether the defendant committed the underlying crime, or whether any other underlying act occurred." Mueller & Kirkpatrick, *supra,* at 616. Statements in a complaint are hearsay, implicating confrontation concerns. 8 Henry W. McCarr & Jack S. Nordby, Minnesota Practice—Criminal Law and Procedure § 32.22, at 468 (3d ed.2001). Ordinarily, "the state will need to call wit-

nesses to prove the other crime, [although] this is not always the case." *Crocker,* 409 N.W.2d at 844. Witness testimony may be needed to establish the underlying acts even for prior convictions obtained by guilty plea. *E.g., State v. Blom,* 682 N.W.2d 578, 601 (Minn.2004). The trial court may exclude some of the proffered other-crimes evidence and "limit inquiry into some of the more prejudicial details." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 404.23[5][a], 404–139 (Joseph M. McLaughlin ed., 2d ed.2006). The parties may also "stipulate to the form in which the evidence is received * * *." McCarr & Nordby, *supra.*

fense, it ordinarily should be excluded." *State v. Shannon,* 583 N.W.2d 579, 585 (Minn.1998). Further, "the more distant the *Spreigl* act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance." *State v. Washington,* 693 N.W.2d 195, 202 (Minn.2005). Temporally remote *Spreigl* incidents may be less objectionable if:

> (1) the defendant spent a significant part of that time incarcerated and was thus incapacitated from committing crimes; (2) there are intervening acts that show a repeating or ongoing pattern of very similar conduct; or (3) the defendant was actually convicted of a crime based on the prior bad act, thus reducing the prejudice of having to defend against claims of acts that occurred years before.

*Ness,* 707 N.W.2d at 689.

 Here, the district court determined that the prior assault had sufficient similarities to the charged offense to be relevant to the issue of identity: both incidents involved intrusions into homes of vulnerable victims whom Wright had known for some time; both incidents occurred in the early morning hours; both incidents were preceded by extensive drug use; and the weapon used and injuries inflicted in both incidents were markedly similar. Wright correctly points out that the *Spreigl* offense occurred 13 years prior to the charged offense and that the incidents occurred in two different cities located 2 hours apart. But temporal-remoteness concerns were considerably reduced by Wright's extensive incarceration between the two offenses; and circumstances of the prior offense were sufficiently similar to the charged offense for Rule 404(b) purposes.

 Nevertheless, even if relevant, *Spreigl* evidence must not be more preju-dicial than probative. Ness, 707 N.W.2d at 686. Courts must balance the probative value of relevant *Spreigl* evidence against the "overarching concern" that such evidence "might be used for an improper purpose, such as suggesting that the defendant has a propensity to commit the crime or that the defendant is a proper candidate for punishment for his or her past acts." *Id.* at 685, 139 N.W.2d 167. This balancing also takes into account the level of need the state has for the evidence. *Id.* at 690, 139 N.W.2d 167. Here, the district court determined that the state had the requisite level of need for the evidence given Wright's statements, and any potential prejudice was mitigated by the limiting instruction given to the jury. *State v. Kennedy,* 585 N.W.2d 385, 392 (Minn.1998) (explaining that standard cautionary instructions to the jury lessen "the probability of undue weight being given by the jury to the evidence"). Accordingly, the admission of other-crimes evidence in this case was not an abuse of discretion.

## II.

 Wright also argues that the prosecutor deprived him of his right to a fair trial by engaging in prejudicial misconduct during the opening statement and closing argument. In reviewing claims of prosecutorial misconduct, this court will reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial. *State v. Johnson,* 616 N.W.2d 720, 727–28 (Minn. 2000). Wright argues that the prosecutor's "overall theme," that Wright's account of what occurred was a lie, amounted to improper comment on his credibility and character. It is improper for the state to express a personal opinion on the defendant's credibility. *State v. Powers,* 654 N.W.2d 667, 679 (Minn.2003). But it is not misconduct for the state to analyze the

evidence and argue that particular witnesses were or were not credible. *State v. Lopez–Rios,* 669 N.W.2d 603, 614 (Minn. 2003), which is what the prosecutor did at Wright's trial. Wright also argues that the prosecutor disparaged his intoxication defense. While the state may argue that there is no merit to the particular defense, the state may not disparage the defense "either in the abstract or by suggesting that the defendant raised the defense because it was the only defense that may be successful." *State v. MacLennan,* 702 N.W.2d 219, 236 (Minn.2005). Examined in context, the prosecutor's remarks related to Wright's intoxication defense had more to do with the merits of that defense and were not aimed at improper disparagement.

### III.

■ Wright challenges the legality of his sentence. Under Minnesota law, a conviction for first-degree premeditated murder is punishable by a term of life in prison. Minn.Stat. § 609.185(a) (2004). A defendant convicted of first-degree premeditated murder who has "one or more previous convictions for a heinous crime" shall be sentenced to life without possibility of release. Minn.Stat. § 609.106, subd. 2(3) (2004). Heinous crimes include "a violation of section 609.221 [first-degree assault]." Minn.Stat. § 609.106, subd. 1a(2) (2004). Because Wright had a prior conviction for first-degree assault, he was sentenced to life without possibility of release. Wright asserts that this sentence violated *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Apprendi* holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. *Apprendi* has no application to a mandatory life sentence with a release disqualifier based on a prior conviction.

### IV.

■ By pro se supplemental brief, Wright argues that he was deprived of his right to effective assistance of counsel. The Sixth Amendment right to counsel is the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). To set aside a conviction on the ground of ineffective assistance of counsel, a defendant must show "that his counsel's representation 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Gates v. State,* 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The record reflects that trial counsel proceeded reasonably; and much of trial counsel's approach that Wright now claims was inadequate relates to trial tactics. What evidence to present and which witnesses to call at trial are tactical decisions properly left to the discretion of trial counsel. *State v. Mems,* 708 N.W.2d 526, 534 (Minn.2006). Wright was not denied effective assistance of counsel.

Affirmed.