*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0688**

State of Minnesota,
Respondent,

vs.

Amy Andrea Horsfield,
Appellant.

**Filed May 18, 2015
Affirmed
Chutich, Judge**

Hennepin County District Court
File No. 27-CR-13-14752

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Susan L. Segal, Minneapolis City Attorney, Jennifer Saunders, Assistant City Attorney, Lisa M. Godon, Assistant City Attorney, Minneapolis, Minnesota (for respondent)

Robert M. Paule, Robert M. Paule, P.A., Minneapolis, Minnesota (for appellant)

Considered and decided by Chutich, Presiding Judge; Rodenberg, Judge; and Reyes, Judge.

**UNPUBLISHED OPINION**

**CHUTICH**, Judge

Appellant Amy Andrea Horsfield challenges the district court's denial of her motion for a new trial, arguing that numerous instances of prosecutorial misconduct

prejudiced her substantial rights. She further argues that the district court abused its discretion in allowing the state to re-open its case to present evidence on an element of her criminal abuse charge and in erroneously instructing the jury. Because the alleged instances of prosecutorial misconduct did not substantially prejudice her rights, and the district court properly exercised its discretion in admitting evidence on an element of her crime and instructing the jury, we affirm.

## FACTS

In 2010, Horsfield worked as a program director at the Salvation Army Beacon Program (Beacon), an inpatient and outpatient chemical dependency program for adults. In October or November 2010, Horsfield initiated sexually explicit communications with A.B., an inpatient resident at Beacon, through texts and emails. In November 2010, Horsfield and A.B. began a sexual relationship. It ended in April 2011, and A.B. left Beacon later in 2011.

Also in 2011, Horsfield began similar sexual communications with another Beacon patient, C.G.[1] Several Beacon employees suspected that Horsfield had a sexual relationship with C.G. and reported these suspicions to Beacon's business director, who was Horsfield's direct supervisor and good friend. After a "cursory investigation," no significant disciplinary action was taken against Horsfield.

---

[1] Horsfield's relationship with C.G. was admitted as evidence of another crime, wrong, or bad act. *See* Minn. R. Evid. 404(b).

2

In February 2012, the business director read letters from C.G. to Horsfield that contained sexual references. The business director gave the letters to the executive director, who said that he did not read the letters but merely passed them along to "legal."

A.B. returned to Beacon in 2012 and in September, a Beacon employee filed an anonymous report with authorities claiming Horsfield was engaging in a sexual relationship with A.B. At the time, Horsfield and A.B. did not have a sexual relationship. The Minnesota Department of Human Services and A.B.'s parole officer investigated the claim, and when A.B.'s parole officer questioned him, he confirmed his past sexual relationship with Horsfield.

The parole officer contacted Sergeant Martinson at the Minneapolis Police Department to report what A.B. had told her. Sergeant Martinson took a statement from A.B. Sergeant Martinson then corroborated A.B.'s statement with hotel receipts matching the dates that A.B. said he stayed at a hotel with Horsfield and by locating a pair of underwear on A.B.'s property that A.B. said Horsfield had given him. The Minnesota Bureau of Criminal Apprehension conducted a DNA analysis of the underwear, and the results showed that Horsfield "could not be excluded from being a possible contributor" whereas 96.8% of the general population could be excluded.

On May 3, 2013, Horsfield was charged with gross misdemeanor criminal abuse. *See* Minn. Stat. § 609.2325, subd. 1(b) (2012) (caregiver to vulnerable adult). In June 2013, while the charges against her were pending, Horsfield began corresponding with C.G.'s brother, J.G., an inmate at the Lino Lakes correctional facility. Sergeant Martinson and an investigator at the department of corrections were concerned that

Horsfield was using J.G. for witness tampering and began to monitor the communications between Horsfield and J.G. No witness tampering was discovered, but police seized several letters of a graphic, sexual nature from J.G.'s prison cell that Horsfield had written him. The sexual phrases in these letters matched the phrases A.B. claimed Horsfield used to initiate a sexual relationship with him. The letters also referenced Horsfield's previous sexual relationship with C.G.

On February 10, 2014, Horsfield's jury trial began, and it lasted over a week. After deliberating for approximately one hour, the jury found Horsfield guilty of criminal abuse.

Horsfield moved for a new trial, arguing that her substantial rights were prejudiced by numerous instances of prosecutorial misconduct. Horsfield further argued that the district court abused its discretion in allowing the state to reopen its case to present evidence on an essential element of the charge. She claimed, in addition, that the district court erroneously defined an element of her charge in the jury instructions. The district court denied Horsfield's motion. Horsfield appealed.

**D E C I S I O N**

## I. Prosecutorial Misconduct

Horsfield argues that the prosecutor engaged in several instances of prosecutorial misconduct at trial, including improperly eliciting vouching testimony, implying through questioning that Horsfield had tampered with witnesses, implying through questioning that Horsfield had a sexual relationship with Beacon's executive director, and impermissibly vouching for A.B.'s credibility in closing arguments. After carefully

reviewing each alleged episode of misconduct, we conclude that none of the alleged behavior, either separately or cumulatively, affected the jury's verdict.

Horsfield's objected-to claims of prosecutorial misconduct are examined first. For objected-to prosecutorial misconduct, this court applies a two-tiered harmless-error test, "the application of which varies based on the severity of the misconduct."[2] *State v. McDaniel*, 777 N.W.2d 739, 749 (Minn. 2010) (quotation omitted). Serious misconduct is "harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error," while less serious misconduct is harmless unless "the misconduct likely played a substantial part in influencing the jury to convict." *State v. Powers*, 654 N.W.2d 667, 678 (Minn. 2003) (quotation omitted).

*Vouching Testimony*

A prosecutor must not intentionally elicit vouching testimony at trial. *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn. 1996). Whether a witness is credible is a question for the jury to decide. *State v. Ferguson*, 581 N.W.2d 824, 835 (Minn. 1998). "[O]ne witness cannot vouch for or against the credibility of another witness." *Id.*

Horsfield argues that the prosecutor elicited improper vouching testimony three separate times—twice in the examination of A.B.'s parole officer and once in the examination of Sergeant Martinson.

During the direct examination of the parole officer, the prosecutor asked, "Did you believe him[?]" in reference to whether the parole officer believed A.B.'s confession

---

[2] The supreme court has questioned the viability of this two-tiered test but has not yet overruled it. *McDaniel*, 777 N.W.2d at 749; *State v. Tayari-Garrett*, 841 N.W.2d 644, 651 (Minn. App. 2014), *review denied* (Minn. Mar. 26, 2014).

regarding his sexual relationship with Horsfield. The prosecutor also asked, "Was there anything about the events that [A.B.] recounted to you or your knowledge of him or your knowledge of [Horsfield] that led you to give credence to [A.B.]'s claims?" Horsfield objected to both of these questions before the parole officer could answer, and the district court sustained the objections.

Here, the prosecutor asked whether the parole officer "believed" A.B. or gave credence to his claims. These questions were attempts to elicit improper vouching testimony, and it was misconduct for the prosecutor to ask them. *See Ferguson*, 581 N.W.2d at 835. But even when we apply the more serious harmless-error test, any resulting error was harmless: these two questions were posed within the context of a week-long trial, Horsfield objected to both of them, and most importantly, the district court sustained the objections *before* the witness answered. Accordingly, Horsfield's guilty verdict was "surely unattributable to the error[s]." *Powers*, 654 N.W.2d at 678 (quotation omitted).

The third alleged instance of vouching occurred on redirect of Sergeant Martinson when the prosecutor asked, "When you spoke with [A.B.] on any of the occasions that you talked to him, was it your impression that [he] was in this for money?" Horsfield objected, and the district court sustained the objection and directed the prosecutor to rephrase. The prosecutor then asked, "Did [A.B.] ever talk about money with you, that he was after a certain amount of money or anything?" Horsfield did not object to this rephrased question.

6

Here, the prosecutor's question to Sergeant Martinson was meant to ascertain A.B.'s potential *bias*. And Horsfield opened the door to this line of questioning when she implied that A.B. had monetary motives based on a civil lawsuit that he had filed. *See State v. Bailey*, 732 N.W.2d 612, 622 (Minn. 2007). Because the prosecutor's question was meant to refute Horsfield's insinuation that A.B. was biased, it was not misconduct.

*Witness Tampering Testimony*

Horsfield next argues that the prosecutor impermissibly elicited testimony from two witnesses that Horsfield had been investigated for witness tampering. Horsfield contends that this line of questioning was misconduct because the prosecutor had no good-faith basis for asking the questions and did not request the direction or permission of the district court to elicit the testimony.

During trial, the following exchange occurred between the prosecutor and the department of corrections investigator:

> Q. All right. Did you monitor the substance of the conversations between [Horsfield] and [J.G.]?
> A. Yes.
> Q. Why did you do that?
> A. I was actually concerned about witness tampering because we knew there was a case that had been filed by [A.B.] and that Amy Horsfield was on the other side of that case. So we were concerned that -- I was concerned that there may be some witness tampering.

Horsfield objected, and the district court sustained the objection and said, "Members of the Jury, I just want to strike the witness'[s] answer about a concern on the witness tampering. So that is not any evidence in this case. You must disregard that. It is not any evidence of anything."

7

During the redirect of Sergeant Martinson, the following exchange occurred between Sergeant Martinson and the prosecutor:

> Q. All right. And once you learned about the fact that [J.G.] was at Lino Lakes, what did you do?
>
> A. I had contact with the Department of Corrections, [J.K.], an Investigator with the Department of Corrections. There were concerns that [J.G.] was having a relationship with Amy Horsfield by both telephone and visits, was believed that the possibility that [A.B.] might be either being intimidated or threatened by [J.G.], who was out at the prison with him.

Horsfield objected and the district court struck Sergeant Martinson's last comment "about a concern about [A.B.]." At the conclusion of Sergeant Martinson's testimony, Horsfield moved for a mistrial based on the two witness tampering statements, which the district court denied. During the sidebar conference for the mistrial motion, the state offered to recall the two witnesses to clarify that no actual witness tampering was observed. Alternatively, the district court proposed a stipulation agreement in which both parties would state that no evidence showed Horsfield attempted to tamper with witnesses. Horsfield declined both suggestions, arguing that the prejudice caused by these two statements could not be undone.

A prosecutor may commit misconduct through seeking to elicit or actually eliciting inadmissible evidence. *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007). Here, the prosecutor knew the two witnesses had investigated Horsfield for witness tampering, but critically Horsfield had not moved in limine to prohibit the state from

8

mentioning witness tampering, and the district court did not instruct the prosecutor to limit her witnesses' testimonies on the subject.

Even if we decided that these questions were misconduct, the district court promptly issued curative instructions after both statements and no prejudicial error resulted. *See State v. McCurry*, 770 N.W.2d 553, 558-59 (Minn. App. 2009) (noting that Minnesota courts presume jurors follow the district court's curative instructions), *review denied* (Minn. Oct. 28, 2009). We also note that Horsfield declined the state's offer to recall the witnesses to clarify that no tampering had occurred and the district court's proposal for a stipulation agreement to the same effect. We therefore conclude that even if the prosecutor's questions were misconduct, no prejudicial error resulted.

*Sexual Relationship Question*

Horsfield also contends that the prosecutor engaged in misconduct when the prosecutor asked the executive director if he had ever had a sexual relationship with Horsfield, to which he immediately replied, "[a]bsolutely not." Horsfield then objected, and the district court struck the question and instructed the jury to disregard the exchange. Horsfield moved for a mistrial, asserting that the prosecutor had no good-faith basis to ask the executive director if he had a sexual relationship with Horsfield. The prosecutor responded that a good-faith basis existed because the business director had given a statement indicating that Horsfield and the executive director had a personal relationship (although not sexual), another Beacon employee had heard rumors about a sexual relationship between Horsfield and the executive director, and Horsfield told A.B. that she had an affair with the executive director.

9

Horsfield argues that the prosecutor's question was unethical because it was intended to advance an improper inference to the jury. We disagree because the question was an appropriate inquiry into the executive director's potential bias.

"Evidence of bias 'is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness'[s] testimony.'" *State v. Clifton*, 701 N.W.2d 793, 797 (Minn. 2005) (quoting *United States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 469 (1984)). Bias includes attitudes, feelings, or emotions of a witness that might affect a witness's testimony. *State v. Lanz-Terry*, 535 N.W.2d 635, 640 (Minn. 1995).

Here, the executive director was Horsfield's superior, and whether he had a sexual relationship with Horsfield was relevant as to his bias. Horsfield argues that even if the question was relevant, Minnesota Rule of Evidence 608(b) would have prohibited admission of any extrinsic evidence to prove otherwise. But Horsfield's reliance on rule 608 is misplaced because "[i]n contrast to extrinsic evidence bearing on veracity, Rule 608(b) does not bar the use of extrinsic evidence to prove a witness'[s] bias." *State v. Garceau*, 370 N.W.2d 34, 40 (Minn. App. 1985), *review denied* (Minn. Sept. 13, 1985); *see also* Minn. R. Evid. 616. Accordingly, we conclude that the prosecutor's question here was not misconduct.

*Prosecutor's Closing Arguments*

Horsfield next contends that the prosecutor impermissibly vouched for A.B.'s credibility in closing arguments. Because Horsfield did not object to these statements in closing, we review them under a modified plain-error test. *See State v. Carridine*, 812

10

N.W.2d 130, 146 (Minn. 2012) (citing *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006)). Horsfield must show "both that the misconduct constitutes error and that the error was plain." *Id.* An error is plain if it "contravenes case law, a rule, or a standard of conduct." *Ramey*, 721 N.W.2d at 302. "The burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights." *Carridine*, 812 N.W.2d at 146.

The first instance of alleged vouching occurred when the prosecutor was arguing that A.B.'s ongoing civil lawsuit did not affect his credibility. The prosecutor stated, "His story is consistent, it's clear, it's believable." The remaining instances of alleged vouching all occurred during the prosecutor's rebuttal closing argument.

Horsfield's closing argument, given immediately before the prosecutor's rebuttal, stressed that the state had not yet proven Horsfield's guilt beyond a reasonable doubt and argued that A.B. was not a credible witness. In response to Horsfield's contention that the state had not met its burden of proof, the prosecutor stated, "We submit to you that we have met that burden in this case. The evidence is strong, it's clear, and you heard me recount it. I'm not going to go [through] that again. But we have met that burden. And I submit to you that that is true."

The prosecutor next argued that A.B. was credible and that the evidence supported his version of events when she stated, "Why should you believe him? Because he told you the truth. It was consistent with the corroborating evidence that came out. The corroboration supports it. There is plenty of evidence that does. It's consistent. It has

11

been consistent over time." The prosecutor continued to defend the credibility of A.B.'s story when she stated,

> If [A.B.] wanted to come in here and lie to you about what happened, wouldn't he have told you a more interesting story? . . . Why didn't he say that they had sex the third time? Because he was telling the truth. He didn't overblow it. He told you the truth . . . That's why you should believe him.

Lastly, the prosecutor also stated, "This lawsuit and all of this stuff about money . . . who knows if he is ever going to see a cent . . . But he told you that that was not his motive. He said he wanted to come clean, and he did. You should believe [A.B.]."

"[I]t is not misconduct for the state to analyze the evidence and argue that particular witnesses were or were not credible." *State v. Wright*, 719 N.W.2d 910, 918–19 (Minn. 2006); *see also State v. Smith*, 825 N.W.2d 131, 139 (Minn. App. 2012) (holding that a prosecutor's statements that a particular witness was "very sincere" and "very frank in his testimony" were arguments regarding the witness's credibility and not improper vouching), *review denied* (Minn. Mar. 19, 2013). *But see State v. Gail*, 713 N.W.2d 851, 866 (Minn. 2006) (stating that vouching occurs if the state implies a guarantee of a witness's truthfulness or expresses a personal opinion regarding a witness's credibility).

We recognize that these statements, especially when considered in isolation, walk a fine line between arguing that A.B. was credible and guaranteeing his truthfulness. *See Gail*, 713 N.W.2d at 866. But we examine a prosecutor's closing statement as a *whole* because "particular phrases or remarks . . . may be taken out of context or given undue prominence." *State v. Jackson*, 714 N.W.2d 681, 694 (Minn. 2006) (quotation omitted).

Here, the prosecutor's closing argument stressed the believability of A.B.'s story in the overall framework of discussing how the evidence supported A.B.'s story. And although the prosecutor emphasized A.B.'s credibility, this emphasis was closely tethered to the evidence and was offered to rebut Horsfield's contention that A.B. lacked credibility. *See Wright*, 719 N.W.2d at 918-19. We therefore conclude that Horsfield cannot show error here.

*Cumulative Effects of Misconduct*

Horsfield contends that even if she is not entitled to a mistrial based on a single episode of misconduct, the cumulative effects of prosecutorial misconduct warrant a new trial. We are not persuaded.

To warrant reversal for a new trial, the prosecutor's misconduct—placed into the context of the entire trial—must be so serious and prejudicial that it impairs a person's constitutional right to a fair trial. *State v. Johnson*, 616 N.W.2d 720, 727-28 (Minn. 2000).

Horsfield analogizes her situation to cases where the supreme court has granted a new trial based on the cumulative effects of prosecutorial misconduct. The misconduct here, however, was considerably less pervasive and prejudicial than the conduct in the cases that Horsfield cites. *See State v. Mayhorn*, 720 N.W.2d 776, 791 (Minn. 2006) (noting that at least 20 pages of the prosecutor's 80-page cross examination showed prosecutorial misconduct); *State v. Porter*, 526 N.W.2d 359, 363-66 (Minn. 1995) (stating that several inappropriate remarks by the prosecutor in his closing warranted a new trial, including suggesting that no salve exists for the conscience of the jury

13

members should they acquit and referring seven times to "[defendant's] School of Sex Education" in closing, although this title was not based on any evidence or any reasonable inference from the evidence); *State v. Harris*, 521 N.W.2d 348, 352 (Minn. 1994) (concluding that prosecutor's examination of three witnesses improperly implied that the defendant caused them all to enter witness protection).

The two isolated instances of misconduct here—considered in the context of a week-long trial and the salutary effect of the district court's rulings—were not similar in frequency or severity to the cumulative misconduct in *Mayhorn*, *Porter*, or *Harris*. And while "the strongest evidence of guilt does not eliminate a defendant's right to a fair trial," *Mayhorn*, 720 N.W.2d at 791, we note that the evidence against Horsfield, including persuasive physical evidence, was strong. The constitution guarantees a fair trial, not an error-free trial. *Id.* at 792. Because the instances of misconduct were isolated and not prejudicial, Horsfield received a fair trial.

## II.     Reopening of Case to Prove Essential Element

Horsfield argues that the district court abused its discretion when it allowed the state to reopen its case and present evidence that Beacon was a licensed facility—an element of Horsfield's criminal abuse charge. This court reviews for an abuse of discretion the district court's granting of a party's request to reopen its case after the party has rested. *State v. Caine*, 746 N.W.2d 339, 352-53 (Minn. 2008).

Minnesota Rule of Criminal Procedure 26.03, subdivision 12(g) permits the district court to allow either party to reopen its case to offer additional evidence in the

14

interests of justice. To "rest" is defined as, "to voluntarily conclude presenting evidence in a trial." *Black's Law Dictionary* 1427 (9th ed. 2009).

The district court, in an abundance of caution, treated the state's offer of proof as a motion to reopen. It did so to avoid penalizing Horsfield for alerting the district court to the state's purported failure to prove that element. But the record shows that when the state offered proof that Beacon was a licensed facility, it had not yet rested. Consequently, nothing prohibited the state from offering additional evidence on this issue.

### III. Jury Instructions on Facility

Horsfield finally contends that the district court's instruction regarding the definition of facility, an element of the crime, materially misstated the law and intruded into the province of the jury. This contention lacks merit.

The district court has broad discretion in determining jury instructions, and this court will not reverse in the absence of an abuse of discretion. *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 (Minn. 2002). It is error for an instruction to materially misstate the law. *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001). Instead, jury instructions must define the crime charged and explain the elements of the offense rather than simply restating the statutes. *State v. Ihle*, 640 N.W.2d 910, 916 (Minn. 2002). A new trial is only required if the jury instructions were erroneous and the resulting error was prejudicial or if the effect cannot be determined. *Morlock v. St. Paul Guardian Ins. Co.*, 650 N.W.2d 154, 159 (Minn. 2002).

The district court's instructions to the jury defined facility as, "an entity required to be licensed by the Minnesota Department of Human Services. It includes a residential or nonresidential program that provides chemical dependency services to adults." Before the instructions were read to the jury, Horsfield objected to the definition of facility, arguing that the statutory definition of facility did not include a chemical dependency program. The district court overruled the objection and concluded as a matter of law that the words "care," "supervision," "rehabilitation," and "habilitation" used within the definitions of "residential" and "nonresidential" properly encompassed chemical dependency services.

Horsfield's conviction of gross misdemeanor criminal abuse requires the defendant to be a "caregiver" providing services "in a facility." Minn. Stat. § 609.2325, subd. 1(b). "Facility" is defined as "a residential or nonresidential facility required to be licensed to serve adults under sections 245A.01 to 245A.16." Minn. Stat. § 609.232, subd. 3 (2012).

Under section 245A.02, subdivision 14 (2012), a residential program[3] is a "24-hour-a-day care, supervision, food, lodging, rehabilitation, training, education, habilitation, or treatment outside a person's own home including . . . chemical abuse programs that are located in a hospital or nursing home and receive public funds . . . ." A nonresidential program provides "care, supervision, rehabilitation, training or habilitation

---

[3] As Horsfield notes in her brief, section 609.2325, subd. 1(b) references a residential or nonresidential *facility* as defined in sections 245A.01 to 245A.16, but sections 245A.01 to 245A.16 define residential and nonresidential *programs*. This discrepancy, however, is minor and does not render the statutory definition of facility ambiguous.

16

of a person provided outside the person's own home and provided for fewer than 24 hours a day, including adult care programs; and chemical dependency or chemical abuse programs that are located in a nursing home or hospital and receive public funds . . . ." Minn. Stat. § 245A.02, subd. 10 (2012).

Here, the district court surmised that a chemical dependency program, like Beacon, fell within the statutory definition of facility because Beacon provides care, supervision, and rehabilitation to persons dealing with chemical dependency issues. The district court's instruction was not a material misstatement of the law; rather, it accurately reflected the statutory definition of facility and reduced a cumbersome statutory scheme into an easily understood instruction. Because the district court has broad discretion in crafting jury instructions, and it properly exercised this discretion here, Horsfield's argument fails.

**Affirmed.**