STATE of Minnesota, Respondent,

v.

Jack Willis NISSALKE, Appellant.

No. A09–1829.

Supreme Court of Minnesota.

July 13, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and Charles E. MacLean, Winona County Attorney, Thomas E. Gort, Assistant County Attorney, Winona, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, St. Paul, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

A jury found appellant, Jack Willis Nissalke, guilty of premeditated murder in the first degree, in violation of Minn.Stat. § 609.185(a)(1) (2010), and other crimes in connection with the death of Ada Senenfelder. The district court convicted Nissalke of first-degree premeditated murder and sentenced Nissalke to life imprisonment. This direct appeal follows. We affirm.

On June 6, 1985, Ada Senenfelder was found murdered in her home in Winona, Minnesota. Senenfelder was cut and stabbed 33 times and bled to death from a stab wound to the heart. Senenfelder's murder went unsolved for decades. But in 2006, Spotlight on Crime, a non-profit organization that works in cooperation with law enforcement agencies on cold cases, offered a $50,000 reward and held a press conference highlighting Senenfelder's murder. Witnesses eventually came forward with information linking Nissalke to the murder.

A grand jury subsequently indicted Nissalke on one count of first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1), one count of murder in the first degree while witness tampering in violation of Minn.Stat. § 609.185(a)(3) (2010), and two counts of aiding and abetting first-degree murder in violation of Minn.Stat. §§ 609.05 and 609.185(a)(1) (2010) (premeditation), and Minn.Stat. §§ 609.05 and 609.185(a)(3) (witness tampering). The case thereafter went to trial.

The State presented evidence at trial to support its theory that Nissalke and Linda Erickson murdered Senenfelder because Senenfelder told the police that Nissalke's friend, James Bolstad, had sexually assaulted someone. Erickson was James Bolstad's girlfriend. Nissalke "hung out" with Erickson, James Bolstad, and other Bolstad family members. As a result of Senenfelder's allegations, James Bolstad was taken into custody for violating his probation in the spring of 1985 and shortly before the murder.

The State connected Nissalke with the murder because he was part of Erickson's efforts to get Senenfelder to withdraw her allegations against James Bolstad. Erickson tried to make Senenfelder sign a document saying that Senenfelder was lying. Erickson told others that Senenfelder "will have to sign that or she's going to have to pay for it. That bitch will die." During a jail phone call with James Bolstad, Erickson said that she was "pissed off" and that Senenfelder should sign a statement to say that James Bolstad did not commit the assault and to "make sure that she had it notarized." Erickson said that, "she would kill her, she could kill [Senenfelder]."

Nissalke assisted Erickson according to the State. Specifically, Erickson and Nissalke went to Senenfelder's apartment to get her to drop the charges against James Bolstad so that he could be released from

jail. They broke the lock on Senenfelder's front door to get inside because Senenfelder refused to open the door. Erickson and Nissalke told Senenfelder to drop the charges in an "angry" manner, and Senenfelder appeared "terrified." Nissalke and Erickson spoke to Senenfelder frequently after they broke into her apartment in a continuing effort to get her to drop her allegations against James Bolstad.

Nissalke admitted to the police that about a week before the murder, Nissalke, Edward Bolstad, James Bolstad's brother, and others stole Senenfelder's bike and radio to get her to drop the allegations she made against James. Nissalke also threatened Senenfelder before the murder and yelled at Senenfelder to make sure she changed her statement.

Senenfelder eventually did recant her statement to James Bolstad's probation officer. Nissalke made a tape recording of Senenfelder's recantation. Erickson was "happy" after hearing the tape, so she decided to throw a party on June 5, 1985. Nissalke, Erickson, Edward Bolstad, and other individuals, including several of the State's witnesses, attended the party. Senenfelder did not.

At some point during the party, Erickson took a phone call in the bedroom. When Erickson came out, she told everyone that the tape-recorded recantation "didn't work" and that James "wasn't getting out of jail." Erickson was "very upset" and "mad" when she delivered the news. Erickson told the partygoers that something had to be done about Senenfelder. Erickson said "she would pay somebody to kill the f——ing bitch." Nissalke asked Erickson "[w]hat she would pay to have her done in and if she would be willing to and somebody would get rid of her." Nissalke also said in a "harsh tone" that "[t]he bitch could be killed easy" and "the bitch has to go[,] . . . [s]he has to die."

Nissalke and Erickson then left the party, saying, "kill the bitch."

A photo the State entered into evidence taken of Nissalke on the night of the party depicted Nissalke carrying a knife that Nissalke wore "all the time." R.B. testified that on the night of Senenfelder's murder, Nissalke went to R.B.'s apartment, which was in the same building as Senenfelder's apartment, and asked R.B. for a flashlight. Nissalke told R.B. that he needed the flashlight "because he had lost a knife" and needed to look underneath the car for it. R.B. testified that when she saw Nissalke that night, he "had a white rag wrapped around his hand" that had a "[r]eddish and pinkish" stain on it. When R.B. asked Nissalke what happened to his hand, Nissalke said that he had cut it while cutting the head off of a turtle. R.B. testified that she saw the cut and that it appeared "fresh."

The next morning, on June 6, 1985, R.B. heard about the murder and went over to Senenfelder's apartment. When R.B. arrived, she saw Nissalke walking "zigzaggy" near Senenfelder's apartment, "looking on the ground like he was looking for something." Later, R.B. heard Erickson ask Nissalke, "Did you ever find the knife?" Nissalke responded, "No."

R.B. also testified that the same morning, she saw Edward Bolstad and another individual take two bags and a blanket out of a car and put them in the dumpster. Edward Bolstad had a cut on his finger, and Edward Bolstad told R.B. that he had cut his finger slicing some turtle meat. Edward Bolstad also asked R.B. if she could wash some clothes for him, and R.B. agreed.

Nissalke and Erickson asked P.C. to come over to help them clean Erickson's apartment that same morning. Erickson instructed P.C. to "throw [away] all of the

clothes" that were in black garbage bags. Erickson also paid P.C. about $400 to help Erickson and Nissalke clean the inside of Erickson's apartment with ammonia and bleach. P.C. testified that they "went through eight gallons and it still was not enough." Nissalke also asked P.C. to look for a missing knife, which P.C. understood to mean the buck knife that Nissalke "always wore" on his side. Nissalke asked P.C. in an "anxious" manner "probably . . . four times" whether she had found the knife.

Later that day, Erickson and Nissalke told the party attendees that Senenfelder had been killed and that everyone needed to get their "story straight." Erickson instructed everyone to say that "nobody left the house, everybody stayed there all night," even though that was not true. Nissalke told the attendees that "nobody had better say anybody left or else."

J.B. told Nissalke during that meeting that she would not say no one left the party because "it would be a lie." Nissalke told J.B. that if she told the truth, then Nissalke "would kill [her] like he did Ada." Nissalke said that he "sliced [Ada's] throat and stabbed her in the heart" and that J.B. "would get the same thing if [she] didn't shut up." Nissalke threatened, "I will get you like I did Ada, once through the heart."[1]

R.B. was also at the meeting, and she testified that Nissalke said: " 'Yeah, she died slow.' 'She didn't die quickly.' 'I stabbed her in the heart.' 'I cut her throat,' " and then Nissalke made a "motion like [he was] cutting across the throat."

The State's theory was that Erickson paid Nissalke to kill Senenfelder. Accord-ing to J.B., Nissalke confessed to J.B. that "[Erickson] paid him" for "doing Ada." J.B. also testified that before the murder, Nissalke "[d]idn't have a lot" of cash but "afterwards he had more." R.B. also testified that 2 or 3 days after the murder, she saw Nissalke pull "a wad of money out of his pocket."

The State also presented additional evidence that Nissalke confessed to killing Senenfelder to several other individuals on several occasions after the murder and threatened to kill these witnesses if they told the truth. Nissalke told J.B. that he killed Senenfelder "[b]ecause she was a f——ing snitch and she deserved it." J.B. asked Nissalke whether he was serious about those statements, and Nissalke "said yes" and said that "he did it." J.B. testi-fied that Nissalke's appearance was "[s]cary because he acted like he did do it and it didn't bother him at all." Nissalke also told J.B. that he cleaned his knife and he described the murder scene as a "bloody mess." J.B. also testified that Nissalke threatened to kill her somewhere between 10 and 20 times after the murder if J.B. told the truth.

Nissalke told S.S. that if she told "any-body I killed [Senenfelder], I will give you what I did to her." Additionally, S.S. tes-tified that more than a year after the murder, she ran into Nissalke outside a bar. S.S. asked Nissalke if he killed Sen-enfelder, and Nissalke calmly said with a "cold stare" that he did kill Senenfelder.

J.N. testified that a few weeks after the murder, Nissalke and J.N. got into a dis-agreement in a bar. Nissalke told J.N., "I will stab you like Ada."

R.N. testified that he had some beers with Nissalke at a campground a few

---

1. A police investigator testified that the earli-est that the news media had reported that Senenfelder was stabbed in the heart was June 9, 1985, 3 days after Nissalke was heard describing the murder.

months after the murder. R.N. testified that while he and Nissalke were sitting at a picnic table, Nissalke grabbed a hunting knife laying on the table and stabbed the table forcefully and repeatedly, saying "Ada, Ada, Ada" with a distant look in his eyes. Another witness, L.P., testified and also described this incident in which Nissalke stabbed the picnic table.

Finally, when a collections agent stopped by Nissalke's residence to get a payment on a loan sometime in 1985 or 1986, Nissalke said, while making a stabbing motion, "I f——ing offed Ada Senenfelder."

The State also presented forensic and physical evidence that connected Nissalke to the murder. Specifically, Nissalke's DNA was found on two cigarette butts in Senenfelder's apartment. Nissalke and Edward Bolstad could not be excluded from a mixture of DNA on a red blanket in Senenfelder's apartment. Nissalke was the only individual whose DNA could not be excluded from the blue bedspread where the body was found. A large butcher knife covered in blood was found with its blade lying across Senenfelder's left wrist. The length of a blood swipe on the knife was consistent with a stabbing. A medical examiner who reviewed the autopsy reports determined that the large butcher knife found at the scene "did not cause all the injuries to the subject's body." The medical examiner determined that at least two smaller knives were used in the attack, and possibly three. But the butcher knife was the only knife found at the scene. The medical examiner also testified that it was "possible" that a small buck knife, like the one Nissalke carried, inflicted some of the wounds.

The jury found Nissalke guilty of all four counts in the indictment. The district court adjudicated Nissalke guilty of the first count of premeditated murder in the first degree in violation of Minn.Stat. § 609.185(a)(1), and sentenced Nissalke to life imprisonment.

On appeal, Nissalke argues that: (1) the district court committed reversible error by entering the jury room and communicating with the jury outside the presence of counsel and Nissalke while the jury was deliberating; (2) the district court denied Nissalke a fair trial by refusing to admit certain alternative perpetrator evidence; (3) the State committed prejudicial misconduct by asserting facts not in evidence in opening statements and closing arguments and by shifting the burden of proof to Nissalke in closing; (4) the district court denied Nissalke a fair trial by failing to strike certain biased jurors for cause; (5) the evidence was not sufficient to support the conviction; (6) the State violated Nissalke's due process rights by failing to preserve physical evidence; and (7) he was denied effective assistance of counsel at trial.

I.

We turn first to Nissalke's argument that the district court's entry into the jury room constituted an error requiring automatic reversal. In *State v. Mims*, we said "that in any criminal case any communication relating to the case occurring during a judge's uninvited entry into the jury room during deliberations and in the absence of defendant and counsel constitutes reversible error." 306 Minn. 159, 165, 235 N.W.2d 381, 386 (1975); *see also Brown v. State*, 682 N.W.2d 162, 167–68 (Minn.2004) (applying the "strict rule" from *Mims*). Nissalke argues that the district court violated this rule and that he therefore is entitled to a new trial.

A.

Because Nissalke's argument is premised on *Mims*, we begin our analysis there.

In *Mims*, the jury had been deliberating for approximately 4 hours when the judge "without request or invitation of the jury and out of the presence of defendant and counsel, entered the jury room," and asked the jurors about the "prospects" of their "arriving at a verdict." 306 Minn. at 160, 235 N.W.2d at 383. The judge "wanted to canvas the [prospects of a verdict] generally [with the jurors] and then talk with the attorneys and the defendant." *Id.* at 160, 235 N.W.2d at 383. In considering the impact of the judge's uninvited entrance into the jury room, we explained:

> The withdrawal of the jury into a separate room, the administration of the oath to their custodians the bailiffs, the traditionally locked door, and other safeguards which prevent any intrusion during deliberations, all serve to emphasize meaningfully the independence of the jury's final, collective, decisional process and to create an atmosphere in which any incorrect notions jurors may have that they are to be influenced by the judge might be removed.

*Id.* at 169, 235 N.W.2d at 388. We concluded that when a judge enters the sanctity of the jury room after deliberations have begun "there is a significant interference with the orderly decisional process, and prejudice to the process results by the implication that the judge has the prerogative of entering the jury room and there exercising the same dominant authority he possesses in the courtroom." *Id.* at 169, 235 N.W.2d at 388. We emphasized that, "such unwarranted entrance disrupts the jury's deliberations, intrudes upon their independence, and transgresses the carefully drawn lines of demarcation between the functions of the trial judge and the functions of the jury." *Id.* at 169, 235 N.W.2d at 388.

After reviewing the record in *Mims*, we concluded that there was a likelihood "that some juror or jurors would have misunderstood or misinterpreted the judge's mere unexpected presence in their domain to mean either that it was about time a verdict was reached or, at the very least, that court officers and personnel would be inconvenienced by extended deliberations." *Id.* at 163, 235 N.W.2d at 385. We also expressed concerns regarding the nature of the district court's communication with the jury and the absence of Mims and his counsel. *Id.* at 169, 235 N.W.2d at 388. We explained that "[w]hen the communication relates to the case, the harm is compounded, for the intrusion, if not demonstrably coercive, violates [a] defendant's right to be present at all stages of the proceedings." *Id.* at 169–70, 235 N.W.2d at 388. We further explained in *Mims* that when the intrusion "occurs in the absence of defendant and counsel, the adversary system of demonstrating prejudice by what was gestured or hinted or effected by other unrecorded conduct of those present is frustrated." *Id.* at 169–70, 235 N.W.2d at 388. Consequently, we adopted a "strict rule prohibiting such intrusions" to minimize "the interruptions of the jury during deliberations," eliminate "the necessity of determining the existence of actual prejudice," and "discouraging repetition of the intrusions." *Id.* at 170, 235 N.W.2d at 388.

### B.

■ With these principles from *Mims* in mind, we turn to an examination of the entry at issue here. In this case, while the district court was instructing the jury, the court discovered errors in the verdict forms as the court was reading those forms to the jury. The court told the jury, "I will correct those and get those to you.... And so that the verdict forms that go into the jury room with you, you can rest assured will be accurate and reflect the law and the charges which are con-

tained." The court also told the jury that "[w]ith you going into the jury room will also be all of the evidence that's been received by the Court, a stack of it."

When the court completed the instructions, the court told the jury:

> From this point on when the bailiffs are sworn and the jury attendants are sworn and you get into the jury room, you can at long last talk to each other about the case, which you haven't been able to do for some weeks, so please do that.

The court then instructed the jury that it would be sequestered during deliberations, which the court told the jury meant that they "will always have a jury attendant with you, unless and until you are in a room." The court excused the alternates, swore in the bailiffs, and then instructed the bailiffs to take their charges to the jury room. The clerk made a notation in the court minutes indicating that the jury began deliberating at this point in the trial, which was at 4:44 p.m.

After the jury left the courtroom, the district court and counsel discussed the errors in the verdict forms. The court told counsel, "I'm going to read [the corrected verdict forms] into the record, unless you wish me to bring the jury back in merely to read it to them?" Both counsel responded, "No, Your Honor." Nissalke's counsel added, "That's not necessary." The court read the corrected verdict forms into the record. The court allowed both counsel to look at the corrected verdict forms and both indicated that they were satisfied with the corrected forms. The court then stated, "I'll walk in with the clerk so that we can deliver this; otherwise, we're in recess." Neither party objected.

Outside the presence of Nissalke and counsel, the district court then made a record of its delivery of exhibits, instructions, and verdict forms to the jury room:

> The Court delivered the exhibits, as well as instructions, as well as the verdict forms to the jury in the company of the Court clerk and both bailiffs. I did inform them one, that they have to return all verdict forms, both the signed, as well as the unsigned; second, I was asked by a juror if they would have the ability to get a videotape of witnesses' testimony. I told them, "No, they did not. It was not videotaped." And last, I was asked whether or not they would have the ability to get the official transcript or a copy of the official transcript, and I told them, "No."
>
> Did I forget anything, Madam Clerk?
>
> THE CLERK: No. That's what I recall.

The court minutes indicate that the interaction the court described on the record took place inside the jury room. Nothing in the record suggests that Nissalke or his counsel learned prior to obtaining the transcripts for this appeal that the jurors had asked the court questions when the court delivered the corrected verdict forms and trial exhibits.

When the district court finished making the record of its delivery of exhibits, instructions, and verdict forms to the jury room, the court swore in the jury attendants. The trial transcript documents the swearing in of the jury attendants and then states, "Jury Out for Deliberations." After the court swore in the jury attendants, the clerk made a notation in the court minutes indicating that the court swore in "[a]dditional bailiffs" and then recessed at 5:06 p.m.[2]

---

2. The district court later went on the record an additional time, this time in the courtroom and in the presence of counsel, to "call . . .

counsel's attention to two communications [the district court] received from the jury." The court referenced two notes that it re-

The district court's encounter with the jury in the jury room in this case is markedly different from the intrusion at issue in *Mims*. In *Mims*, the judge went into the jury room specifically to "inquir[e]" as to the jury's "prospects" of reaching a verdict, and he asked the jury for an "impression . . . as to . . . when" the jury might reach a verdict. 306 Minn. at 160–61, 235 N.W.2d at 383–84. The judge remained in the jury room as the jurors voted on the question of how long deliberations would continue that evening. *Id.* at 161, 235 N.W.2d at 384. Through his presence in the jury room and his inquiries to the jury as to the status of their deliberations, the judge in *Mims* inserted himself into the jury's decision-making process. *See id.* at 163, 235 N.W.2d at 384 ("[O]ur concern is with the influence this particular type of intrusive communication has upon the integrity of the proceedings and the independent role and function of a jury during its deliberations on its verdict.").

Similarly in *Brown*, the only other case where we have applied the rule from *Mims*, the judge went into the jury room and questioned the jury as to whether there was "realistically . . . any possibility" of the jury reaching a verdict that evening. 682 N.W.2d at 165. By going into the jury room after deliberations had begun, the judge in *Brown* inserted himself into the jury's deliberative process. *Id.* at 167 (noting that the judge's " 'unwarranted entrance disrupts the jury's deliberations [and] intrudes upon their independence' " (quoting *Mims*, 306 Minn. at 169, 235 N.W.2d at 388)).

Because the judges in *Mims* and *Brown* entered the jury room after the jury had begun deliberating and questioned the jury as to the status of their deliberations, those judges invaded the independence of the jury and intruded upon the jury's decision-making function. *See Mims*, 306 Minn. at 163, 235 N.W.2d at 384; *Brown*, 682 N.W.2d at 167. By contrast, the judge's entry in this case, while undoubtedly improper, does not constitute an interference with the jury's independent decision-making authority. The judge went into the jury room only a few minutes after the jury left the courtroom and after telling the jury that he would be coming in with the corrected verdict forms.

But Nissalke asserts that the "during its deliberations" language of the *Mims* rule should be read as any moment after the court's clerk makes a notation in the court minutes indicating that the bailiff is sworn and the jury began deliberating. *Mims*, 306 Minn. at 163, 235 N.W.2d at 384. Based on this assertion, Nissalke argues that, even though the jury had just left the courtroom minutes before the judge came in and even if the jurors were expecting the court to provide them the corrected verdict forms, any entry into the jury room by the judge that occurred after 4:44 p.m. violated the *Mims* rule and requires reversal. We disagree.

Unlike *Mims* and *Brown*, the record does not establish that the jury had begun deliberating when the judge entered the jury room.[3] The court minutes indicate

ceived from the jury. The court first stated that the jury gave the bailiff a note to give to the district court asking what some exhibits were titled, and the district court sent a communication back to the jury identifying the exhibits in question. The court also said that the jury requested a transcript of specific testimony, and the court returned the jury's note with a written communication to the jury that

the transcript requested was not in evidence. Nissalke makes no argument on appeal regarding these communications, and so we do not discuss them further.

3. In *Mims*, there was no doubt that the jury was well into the deliberative process when the judge entered the jury room. *See* 306 Minn. at 160, 235 N.W.2d at 383 (explaining

that the jury began their deliberations at 4:44 p.m., directly after the first set of bailiffs were sworn, and before the judge went into the jury room. But the first indication in the transcript that the jury was deliberating appears after the court returned from the jury room, made a record of its communications with the jury, and swore in the jury attendants at 5:06 p.m. The transcript notation is consistent with the court's instructions to the jury, which indicated that the jury would not start deliberating until after the jury attendants were sworn.[4]

Nissalke argues that there is no evidence in the record to establish that the jury even knew when the jury attendants were sworn, because this happened outside the presence of the jurors. He contends that the swearing in of the jury attendants

therefore cannot provide the basis for the commencement of deliberations. In the alternative, he argues that we should resolve any conflict as to the start of deliberations against the State and hold that the rule of *Mims* applies.

■ The *Mims* rule, however, is triggered only when the jury is into the deliberative process, a process that must be performed independent of outside influence. When the jury is performing its decision-making function, the chance that the judge's presence would constitute an intrusion into the jury's independence is too great and thus such intrusions are strictly prohibited. That same opportunity for intrusion does not exist in this case, where the record does not establish that formal jury deliberations had begun when the judge went into the jury room.[5]

---

that the jury retired at 12:04 p.m. and that the judge's uninvited entry into the jury room occurred at 4:15 p.m.). In *Brown*, there also was no dispute that deliberations had begun when the judge went in to the jury room on each of the three occasions discussed in our opinion. *See* 682 N.W.2d at 164–65 (discussing judge's multiple entries into the jury room).

4. Relying on the court minutes, the dissent asserts that deliberations plainly began at 4:44 p.m. Even though the district court told the jury that deliberations could not begin until the jury attendants were sworn, the dissent argues that the swearing in of the jury attendants is irrelevant to the question of when deliberations began because the jurors were unaware of "when the jury attendants were sworn." The dissent's argument proves too much, however, because the jurors were also unaware of when the clerk made the jury-deliberating entry in the court minutes.

5. That the jury was expecting the judge to bring the jury the corrected verdict forms supports the conclusion that the jury had not yet begun deliberations when the judge came into the jury room. The district court told the jury before the jurors left the courtroom that, "I will correct [the verdict forms] and get those to you" and "going into the jury room

will also be all of the evidence that's been received by the Court, a stack of it." Based on what the court said, the jurors were expecting the court to provide them the corrected verdict forms and the trial exhibits shortly after they arrived at the jury room. The dissent's analysis ignores the importance that the "uninvited entry" played in our adoption of the strict *Mims* rule. *See Mims*, 306 Minn. at 164, 235 N.W.2d at 386. Without any discussion of whether the concerns underlying "uninvited entries" are also present during "expected entries," the dissent asserts that we should extend the strict *Mims* rule to the expected entry in this case. But we grounded the *Mims* rule in "our concern . . . with the influence" the "particular type of intrusive communication has upon the integrity of the proceedings and the independent role and function of a jury during its deliberations on its verdict." *Id.* at 163, 235 N.W.2d at 384. In contrast to *Mims*, the entry at issue here occurred just minutes after the jury left the courtroom and it was expected based on the comments the court made to the jury. Entries like the one in this case do not have the same type of influence on the integrity of the proceedings and the jury's independent role and function as the uninvited entry in *Mims*.

The dissent also mischaracterizes our analysis as an improper "discussion about why

We agree with the dissent that all entries by the district court into the jury room should be strongly discouraged, including the entry that occurred here. But that does not necessarily mean that the remedy for all such entries must be the same. Rather, in determining if the *Mims* rule applies, we look at whether the jury is into the deliberative process thereby implicating the principle underlying the *Mims* rule—preventing intrusions during deliberations that undermine the independence of the jury's final, collective, decisional process. This approach is consistent with our analysis in *Brown.* We applied the *Mims* rule in *Brown* because the entry in *Brown* occurred after the jury was into the deliberative process and therefore the entry presented the same concerns as *Mims. See Brown,* 682 N.W.2d at 167–68. In this case, the record does not establish that the jury was into the deliberative process when the judge went into the jury room and therefore the concerns underlying the *Mims* rule are not present here.

The concern that the court not intrude upon the jury's deliberative process is not present in this case because the jury had left the courtroom just a few minutes before the judge entered the jury room and the jury knew that the corrected forms and the exhibits were yet to be delivered to the jury room when the district court came into the jury room. The two questions the judge received were generic and not about specific pieces of evidence.[6] And the exchange happened as the evidence in the case was being delivered into the jury room. While the court certainly should not have gone into the jury room itself to deliver the corrected verdict forms and the exhibits, the record establishes that the concerns over the court's intrusion into the jury's independent decision-making function that underlie the *Mims* rule are not implicated here.

The other concerns articulated in *Mims* are also not present in this case. Our concern that the adversarial process be protected is not frustrated in this case because the court provided Nissalke with an opportunity to have a record made of the court's delivery of corrected verdict forms. *See Mims,* 306 Minn. at 169–70, 235 N.W.2d at 388. When the court offered to bring the jurors back into court for a reading of the corrected verdict forms, Nissalke's counsel replied, "That's not necessary." The concern we expressed in *Mims* over the defendant's right to be present is also not implicated here. *See id.* at 169–70, 235 N.W.2d at 388. This is so because when the court informed the parties of its intent to walk into the jury room with the court's clerk to deliver the corrected verdict forms, neither Nissalke nor his counsel objected.[7]

---

Nissalke was not prejudiced by the trial judge's entry into the jury room." Our analysis focuses on whether concerns underlying the strict *Mims* rule apply, not whether Nissalke demonstrated prejudice. We agree that if we were to extend the strict *Mims* rule to entry in this case, there would be no need for Nissalke to show prejudice.

6. Citing authority in which deliberating jurors asked whether the trial transcript was available for review, the dissent asserts that it follows that jurors who ask such a question are deliberating. The flaw in this argument is revealed by the fact that if a juror asked during voir dire (or even as the jury is being led out of the courtroom to the jury room) whether a transcript would be available for review, no one would seriously contend that the question demonstrated that the jurors were deliberating. Instead, the issue of whether the deliberative process that the *Mims* rule is designed to protect has begun depends on the circumstances of each case.

7. Nissalke contends that the district court erred by not sua sponte making a contemporaneous record of his interaction with the jury. In other words, he contends that the court should have had the court reporter tran-

In sum, under the unique circumstances presented here, where the district court's entry into the jury room occurred a few minutes after the jury left the courtroom and the record does not establish that the jury had begun formal deliberations, the entry does not undermine the traditional safeguards preventing intrusions during deliberations or the independence of the jury's final, collective, decisional process. We therefore hold that the automatic reversal rule from *Mims* does not apply.

## C.

■ Our conclusion that *Mims'* automatic reversal rule is inapplicable does not end the analysis. We still must determine whether the district court's erroneous entry and communication with the jury was harmful in this case. *See* Minn. R.Crim. P. 31.01 ("Any error that does not affect substantial rights must be disregarded."). Nissalke's counsel did not object to the district court's proposal to enter the jury room for the purpose of delivering the corrected verdict forms. But, as Nissalke notes, when the judge went into the jury room, he told the jury that it needed to return all the verdict forms and he responded to two questions from the jury.

■ A defendant has the right to be present at all critical stages of his trial, and we have held that the court's communications with the jury are a critical stage. *See State v. Martin (Martin I)*, 695 N.W.2d 578, 586 (Minn.2005). As with

scribe the interaction as it happened. But Nissalke has not come forward with any evidence suggesting that the account the district court provided on the record does not accurately reflect what transpired in the jury room. *See State v. Martin (Martin II)*, 723 N.W.2d 613, 624 (Minn.2006) (holding that defendant had burden to produce "some evidence suggesting contact with the jury outside the scope of the agreement" reached between counsel and the court).

many constitutional rights, a defendant can waive the right to be present. *State v. Martin (Martin II)*, 723 N.W.2d 613, 619–21 (Minn.2006) (explaining that Martin's failure to object constituted a waiver of his right to be present). Absent such a waiver, however, it is improper for the court to communicate with the jury on a non-housekeeping matter outside the presence of the defendant. *Id.* at 619.[8] The State makes no argument that Nissalke agreed that the judge could tell the jurors that they needed to return all verdict forms and also answer questions from the jury in Nissalke's absence, and the record contains no such agreement.

■ We have recognized that where the district court errs by communicating with the jury outside the defendant's presence, that error is reviewed under a harmless-error standard to determine whether it warrants reversal. *State v. Sessions*, 621 N.W.2d 751, 756 (Minn.2001). Because the error at issue here involves the judge's entering the jury room and communicating with the jury outside the defendant's presence, we will review that error under the *Sessions* standard. Under that standard, an error is harmless if the verdict was "surely unattributable" to the error. *Id.* at 756. We consider "the strength of the evidence" and the "substance of the judge's response" when determining whether an erroneous judge-jury communication was harmful. *Id.*

8. A judge's communication with the jury about housekeeping matters does not violate the defendant's right to be present. *Ford v. State*, 690 N.W.2d 706, 713 (Minn.2005). The State makes no argument that the matters raised in the juror's questions were housekeeping matters.

Our careful review of the record confirms the verdict was surely unattributable to the errors at issue. The State's evidence against Nissalke, discussed *infra* Part V, was very strong. Nissalke did not object when the court indicated that it was going to bring the corrected verdict forms into the jury room. Additionally, the substance of the district court's comments while in the jury room cannot be construed as favoring one side or the other. The court's statement that the jury needed to return all the verdict forms was an accurate statement of what was required of the jury, and the court's responses to the juror's questions provided cursory and substantively appropriate answers to the two questions. *See Sessions*, 621 N.W.2d at 756–57 (finding error harmless where the evidence of guilt "was strong" and the court "did not issue any new instructions in its responses, and the instructions repeated did not favor the prosecution or defense"). We therefore hold that Nissalke is not entitled to a new trial based on the district court's entry into the jury room and communication with the jury outside Nissalke's presence.

## II.

We turn next to Nissalke's claim that he is entitled to a new trial because the district court refused to admit certain evidence that alternative perpetrators may have committed the crime. Specifically, Nissalke contends that the court should have admitted evidence that B.F. was an alternative perpetrator. He further argues that the court denied him the right to present a defense through unduly restricting Nissalke's cross-examination of the State's witnesses. We consider each argument in turn.

## A.

 Nissalke contends that the district court erred in not allowing him to

offer evidence that B.F. may have committed the crime. Evidentiary rulings are "within the sound discretion of the district court and we will not disturb those rulings on appeal absent a clear abuse of that discretion." *State v. Stone*, 784 N.W.2d 367, 370 (Minn.2010). A defendant has a right to present a meaningful defense, which "includes the right to present evidence that a third party may have committed the crime for which the defendant is charged." *State v. Jenkins*, 782 N.W.2d 211, 226 (Minn.2010); *see also* Minn. Const. art. 1 § 6. But a defendant who wishes to admit alternative perpetrator evidence must first make a threshold showing that the evidence the defendant seeks to admit has an "inherent tendency to connect the alternative perpetrator to the commission of the charged crime." *State v. Larson*, 788 N.W.2d 25, 36–37 (Minn. 2010) (citation omitted) (internal quotation marks omitted). The "purpose of this foundational requirement is to avoid the use of bare suspicion and safeguard a third person from indiscriminate use of past differences with the deceased." *Jenkins*, 782 N.W.2d at 224 (alterations omitted) (citation omitted) (internal quotation marks omitted). If the defendant meets this foundational requirement, "the court must still evaluate [the alternative perpetrator] evidence under the ordinary evidentiary rules as it would any other exculpatory evidence." *State v. Jones*, 678 N.W.2d 1, 16 (Minn.2004). With these principles in mind, we turn to the record to determine whether the district court abused its discretion in the handling of Nissalke's proposed alternative perpetrator evidence.

Nissalke alleged that B.F. was an alternative perpetrator based on his theory that Senenfelder was a witness against B.F. in at least two criminal cases. During the trial, Nissalke asked BCA Agent Michael O'Gorman if he "discovered" whether Sen-

enfelder "was involved as a witness in two criminal cases." The State objected on hearsay grounds and the district court sustained the objection. Nissalke then rephrased the question and began to solicit testimony from Agent O'Gorman about Senenfelder's involvement as a witness in other cases without objection. When Nissalke specifically mentioned a "federal prosecution involving the sale of firearms and stolen property," and asked if O'Gorman had "follow[ed] up on any other cases that Ms. Senenfelder may have been involved or was involved in as a witness," the State objected again.

Counsel and the district court discussed the objections and rulings while the jury was at lunch. Nissalke argued that the alternative perpetrator evidence was relevant and necessary to allow Nissalke to present a complete defense. Nissalke then proffered the following to establish foundation: (1) that Senenfelder was involved as a witness in two criminal cases, including a federal gun case; (2) that "[e]ach case ha[d] particular players who would not only benefit from Ms. Senenfelder's demise but in fact are capable of [causing her] demise based on their personality structure or past criminal history"; (3) that O'Gorman had in fact investigated "those two matters"; (4) that B.F. had threatened Senenfelder; (5) that Senenfelder visited B.F. "every Wednesday up to the time she was killed, but because [B.F.] was so angry with [Senenfelder] about certain reasons, she didn't go for the first time on this particular Wednesday, the Wednesday she was killed"; and (6) that alternative suspects would "benefit from Ms. Senenfelder's demise." Nissalke then explained that "the State may have on its face an apparent legitimate hearsay objection. I was not using it or intending to use it as truth of the matter asserted that there were actually these cases, just

that this particular BCA agent knew of them and intended to follow up."

The district court agreed to allow O'Gorman to "use what information he received from others solely for the purpose of showing why he acted in a certain way." But the court clarified that Nissalke had not yet demonstrated that there was "an inherent tendency" to show that an alternative perpetrator "could have committed the crime." The court stressed that Nissalke was "permitted to inquire" about relevant evidence to "try to establish" his theory, but that Nissalke was required "to submit only admissible evidence, and hearsay is not admissible evidence unless it is under a noted exception."

Nissalke continued his examination of O'Gorman when the jury returned. Nissalke solicited more testimony from O'Gorman about his investigation into other cases and alternative suspects. The State objected. The court provided a limiting instruction to restrict the jury's consideration of O'Gorman's testimony about the other investigations "solely for the purpose of determining what, if anything, [O'Gorman] might have done based upon what he heard." Nissalke was then allowed to continue with the questioning of O'Gorman's knowledge of the other cases. O'Gorman admitted that he did not pursue the connection between Senenfelder's murder and the federal gun case and did not know if anyone else did.

Later in the trial, the State called Agent Dennis Fier to testify to the steps he took in the investigation. On cross-examination, Nissalke elicited testimony about whether there were "[t]wo separate groups . . . [of] people" with motives to kill Senenfelder. When Nissalke asked, "And one group was the [B.F.] group?," the State objected for lack of foundation and the objection was sustained. Nissalke clarified that he was not eliciting testimony

"for the truth of the matter," and the district court allowed Nissalke to continue questioning into "the [B.F.] track" with a limiting instruction to the jury that the evidence being offered was "not evidence of the truth or falsity of what is stated." The district court then allowed Nissalke to elicit testimony that B.F. was charged with a federal crime, that the "[B.F.] track" had a motive to kill Senenfelder because she "had given information to law enforcement concerning [B.F.]'s fencing operations," that B.F. would have a motive to seek "revenge" against Senenfelder or to prevent her from testifying, and that Fier could not recall which leads he actually pursued.

After the jury was excused for the day, the State renewed its concerns that Nissalke was attempting to admit alternative perpetrator evidence without a proper foundation while cross-examining Fier. Specifically, the State noted that Fier's testimony as to the federal gun case against B.F. was more akin to reverse-*Spreigl* evidence, which was subject to even stricter foundational requirements than alternative perpetrator evidence,[9] was more likely to confuse and mislead the jury, and would require the State to try the case by essentially disproving that B.F. was the perpetrator. Nissalke made an additional offer of proof but this proffer was not materially different from that presented earlier. The district court, concluding that the legal standard required "something that would indicate that the [alternative perpetrator] may have been responsible for the crime," determined that, "at this point in time" the standard had "not been met."

The next morning, before trial continued, Nissalke asked the district court to reconsider its ruling barring additional testimony suggesting B.F. as the perpetrator. Nissalke provided as an additional offer of proof: (1) Fier's testimony that B.F. "had something to gain from Ada Senenfelder's death"; (2) that Senenfelder "squeal[ed] on [B.F.] and his colleagues"; (3) that E.L., one of B.F.'s associates, threatened to kill Senenfelder; (4) that E.L. told B.F. that "he was going to put a hit out on [Senenfelder]"; (5) that B.F. tried to blame someone else after the murder; (6) that B.F. was bribing Senenfelder by "paying her money on a weekly basis" and allowing her to stay in his home; (7) that Senenfelder was afraid to visit B.F. on the day of the murder; (8) that the police failed to follow up on the B.F. lead; and (9) that E.L. could not account for his whereabouts on June 5, 1985. The court agreed with Nissalke that "the defendant should be entitled to offer what it wishes to offer for a defense," but emphasized that the evidence, "just like [in] the State's case, ... still ha[d] to be admissible evidence or at a stage somewhere where it is admissible." The district court then ruled that the defense did not establish a "nexus" between an alternative perpetrator and the death of the victim because "[m]otive alone is not enough."

Later in the trial, Nissalke sought permission from the district court outside the presence of the jury to elicit alternative perpetrator testimony from a witness that B.F. said he would kill Senenfelder by slitting her throat. Nissalke also claimed that the witness would testify that B.F. said he would kill an informant in the federal gun case by " 'mak[ing] it look like

---

9. In *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), we discussed the State's use against the defendant of the defendant's prior criminal behavior. In the reverse-*Spreigl* context, it is the defendant who seeks to admit prior criminal behavior of the alternative perpetrator. *See, e.g., State v. Swaney,* 787 N.W.2d 541, 557 (Minn.2010) (discussing requirements for admission of reverse-*Spreigl* evidence).

an accident' " and that later that informant died in a fire after falling to the bottom of the stairs. The court denied Nissalke's request on the basis that Nissalke did not show sufficient grounds at that time "to get past simple hearsay violations, in addition to presenting it as alternative perpetrator evidence."

In Nissalke's closing arguments, Nissalke referenced the identification by police of "two tracks"—the "Bolstad group" and "the [B.F.] track." The State objected, and the court instructed Nissalke, "Go no further in that area." Nissalke continued by attacking the State's failure to investigate the alternative perpetrator theory, the State objected, and the district court cautioned Nissalke to "[l]eave that name out." Nissalke also mentioned in closing a "second prong" of people who "also had something to gain" without objection or caution from the district court.

Our review of the record establishes that to the extent that the district court did limit the alternative perpetrator testimony, the court did not abuse its discretion in determining that the threshold foundational requirement had not been met. Despite all of his attempts at proof, Nissalke presented evidence showing only that B.F. had a motive to kill Senenfelder and may have threatened to kill her. The evidence also demonstrated that B.F. was in prison when Senenfelder was murdered. Nissalke tried to overcome this fact by tying B.F. to another alleged perpetrator, E.L., who could not account for his whereabouts on June 5, 1985. But here, like in *State v. Vance*, 714 N.W.2d 428, 437 (Minn. 2006), where we determined that the defendant had not met his foundational showing, Nissalke did not provide any evidence that actually tied either B.F. or E.L. to the scene of Senenfelder's murder, or showing that either had the opportunity to commit the crime. *See also State v. Larson*, 787

N.W.2d 592, 598 (Minn.2010) (holding that district court did not abuse its discretion in excluding alternative perpetrator evidence because "Larson did not proffer any evidence connecting [alleged alternative perpetrator] in any way to the events leading up to the murder, any evidence showing he was at or near the murder scene, or any evidence that he had the opportunity to murder" and "[e]vidence of motive alone does not have the inherent tendency to connect a third party to the commission of the crime").

In his additional attempts to establish foundation, Nissalke speculated that Senenfelder was "afraid" of B.F. because she stopped visiting B.F. in prison sometime before she was killed, and alleged that B.F. was "bribing" Senenfelder to keep her quiet. Our "task is to determine whether the evidence, not the assertions, contained in the proffer provides the required" foundation. *Jenkins*, 782 N.W.2d at 228. Nissalke's bare assertions as to what could have happened are not evidence and do not have an "inherent tendency" to connect B.F. or E.L. to the crime. *See Larson*, 788 N.W.2d at 34–35. We therefore hold that the district court did not abuse its discretion in limiting the introduction of alternative perpetrator evidence.

### B.

 Nissalke also contends that the district court's evidentiary rulings erroneously restricted his right to present a complete defense. Like all defendants accused of criminal behavior, Nissalke "has the constitutional right to present a complete defense." *State v. Atkinson*, 774 N.W.2d 584, 589 (Minn.2009). But the evidence proffered in support of the defense must still comply with the rules of evidence. *See Jenkins*, 782 N.W.2d at 224 (noting that the right to present a defense "is not

absolute," and "courts may limit the defendant's evidence to ensure that the defendant does not confuse or mislead the jury"); *Jones,* 678 N.W.2d at 16 (noting that "when a defendant seeks to introduce exculpatory evidence based on an alternative perpetrator theory, the court must still evaluate this evidence under the ordinary evidentiary rules as it would any other exculpatory evidence").

Our review of the record demonstrates that the district court's evidentiary rulings did not deny Nissalke the right to present a complete defense. Nissalke was allowed to present evidence challenging the State's identification of Nissalke as the perpetrator and the police investigation into alternative suspects. The court also allowed Nissalke several opportunities to present his alternative perpetrator theory in cross-examination of the State's witnesses. The court also allowed testimony that Senenfelder was a witness in other cases, that O'Gorman did not follow up on leads connecting a federal investigation to Senenfelder's murder, that Agent Fier could not remember if he had followed up on the B.F. lead, and arguments in closing that there was a "second prong" of people who "also had something to gain" from Senenfelder's murder. We therefore hold that Nissalke is not entitled to a new trial based on his claim that the court's evidentiary rulings violated his right to present a complete defense.

### III.

■ We turn next to Nissalke's claim that the State committed prejudicial misconduct. Nissalke contends that the State committed misconduct by referring to matters that were not in evidence and by shifting the burden of proof. We review prosecutorial misconduct to determine whether the conduct, "in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Mayhorn,* 720 N.W.2d 776, 785 (Minn.2006) (citation omitted) (internal quotation marks omitted).

### A.

Nissalke alleges that the State committed prosecutorial misconduct in opening and closing arguments by referring to facts that were not in evidence. Nissalke did not object to any of these errors at trial.

■ When defense counsel does not object to alleged prosecutorial misconduct, we review the conduct under a modified plain error test. *State v. McDaniel,* 777 N.W.2d 739, 749 (Minn.2010). Under this test, the defendant has the burden of proving (1) that an error was made and (2) that it was plain. *Id.* Then, "[i]f the defendant satisfies this burden, the burden shifts to the State to demonstrate that the error did not affect the defendant's substantial rights." *Id.*

### 1.

■ Nissalke's first alleged instance of prosecutorial misconduct relates to the State's reference in its opening statement to Nissalke's reaction to a search warrant. Specifically, Nissalke moved in limine to exclude evidence that he resisted arrest or fought officers when they executed a warrant to obtain his DNA. In a May 18, 2009, pre-trial hearing on the motion, the district court said it would "reserve a decision on that one" and would "take it under advisement." In a written order on the motion filed on June 2, 2009, the day before opening statements, the district court referenced the motion and determined that its previous ruling at the pretrial hearing to reserve a decision on the issue would stand.

The next day, on June 3, 2009, the State said in its opening:

Police officers had a court order to obtain some samples from the defendant. . . . You will hear about the defendant's reaction to that. He tore up the search warrant and threw it on the ground, went back in his house, came back out with a metal bar, until the police officers drew their service weapons and had to order him to put the bar down before he did that.

Nissalke did not object.

We have held that if "the evidence sought to be admitted is questionable, a prosecutor should obtain a ruling from the trial court before commenting on the evidence" in her opening statement. *State v. Smallwood*, 594 N.W.2d 144, 150 (Minn. 1999). In this case, Nissalke brought a written motion in limine to preclude this evidence and renewed it in a pretrial hearing. Because the district court did not decide pre-trial whether or not the evidence should have been excluded, Nissalke argues that under the standard articulated in *Smallwood*, the State should have obtained a ruling on the motion before it referenced the evidence during its opening statement.

■ But even if the State's reference in opening statement could be considered plain error, Nissalke is not entitled to a new trial on this basis if the State proves that the error did not affect Nissalke's substantial rights. *See McDaniel*, 777 N.W.2d at 749. A defendant's substantial rights are affected "if there is a reasonable likelihood that the error actually impacted the verdict." *Id.* Here, the district court instructed the jury that "the arguments or other remarks of an attorney are not evidence. If the attorneys or I have made or should make any statement as to what the evidence is which differs from your recollection of the evidence, you should disregard the statement and rely solely on your own memory." This instruction, the de

minimis nature of any mention of facts not in evidence, and the strength of the State's case, all indicate that there is no reasonable likelihood that any improper reference to facts not in evidence in the State's opening statement actually impacted the verdict. *See McDaniel*, 777 N.W.2d at 749. We therefore hold that Nissalke is not entitled to a new trial on this misconduct claim.

2.

Nissalke also contends that the State's statements in its opening and closing arguments that Senenfelder actually witnessed a sexual assault were prejudicial misconduct because this fact was not admitted into evidence. Our review of the record confirms that, although there was testimony that Senenfelder reported James Bolstad for a sexual assault, there was never testimony that Senenfelder was an actual eyewitness to the assault.

■ It is "improper for a prosecutor to refer to evidence in an opening statement without a good-faith basis for believing the evidence is admissible." *Smallwood*, 594 N.W.2d at 150. But it is not prejudicial error when a prosecutor discusses expected testimony in his opening statement but does not produce the evidence at trial. *See McDaniel*, 777 N.W.2d at 750. This is so because "[m]any things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance." *State v. Bland*, 337 N.W.2d 378, 381 (Minn.1983), *quoted in McDaniel*, 777 N.W.2d at 750.

■ With respect to the State's opening statement, the record does not reflect any motion to preclude testimony that Senenfelder actually witnessed the assault or any reason why this fact should be excluded, and Nissalke has not otherwise

demonstrated that the State lacked a "good faith basis" for believing that this testimony might be elicited at trial. We therefore hold that Nissalke has not demonstrated that the reference regarding the sexual assault in the State's opening statement was plain error.

 During its closing argument, however, the State knew that no witnesses had testified that Senenfelder directly observed the assault. But we have held that the State may present "all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence" in its closing argument. *State v. Pearson*, 775 N.W.2d 155, 163 (Minn.2009). Given that Senenfelder reported the assault, we cannot say that the prosecutor committed plain error in arguing that she witnessed it.

### 3.

Nissalke also challenges the State's references to Nissalke making a "loud party call" to the police in order to establish an alibi. Specifically, the State referenced:

> The loud party call. The loud party call. Why have the police come to the party[?] ... Again, an effort to establish an alibi....

> The defendant knew that the purpose of that loud party call was to get the police there to try to create an alibi. You don't need to try to create an alibi beforehand unless you thought about committing the crime beforehand. That also proves premeditation.

Nissalke did not object.

 We look at the closing argument "as a whole, rather than just selective

phrases or remarks that may be taken out of context or given undue prominence to determine whether reversible error has occurred." *McDaniel*, 777 N.W.2d at 751 (citation omitted) (internal quotation marks omitted). Looking at the closing as a whole, the assertion that Nissalke was trying to establish an alibi was presented as an inference that could be drawn from the facts and not as an unsupported assertion of a substantive fact. *See Pearson*, 775 N.W.2d at 163. We therefore hold the statement about the loud party call was not plain error.

### B.

 Nissalke also contends that the State committed misconduct by improperly shifting the burden of proof to him. Nissalke objected to some of the asserted instances of burden-shifting. We have used two different harmless-error standards to review objected-to prosecutorial misconduct. *McDaniel*, 777 N.W.2d at 749 (citing *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974)).[10] The *Caron* harmless-error test for less serious prosecutorial misconduct requires us to ask "whether the misconduct likely played a substantial part in influencing the jury to convict." *McDaniel*, 777 N.W.2d at 749 (citing *Caron*, 300 Minn. at 128, 218 N.W.2d at 200). The *Caron* harmless-error test for "unusually serious" misconduct requires us to ask whether the alleged misconduct was "harmless beyond a reasonable doubt." *McDaniel*, 777 N.W.2d at 749; *State v. Martin*, 773 N.W.2d 89, 104 (Minn.2009). We will find an error to be harmless beyond a reasonable doubt only

---

**10.** Whether the two-tiered test set forth in *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974), is still good law has been questioned in some of our recent decisions. *See State v. McCray*, 753 N.W.2d 746, 754 n. 2 (Minn.2008); *State v. Pendleton*, 759

N.W.2d 900, 911 n. 3 (Minn.2009). Because we find that the prosecutor did not commit misconduct of any type we need not, and do not, decide in this case whether *Caron* is still good law.

if the verdict rendered was "surely unattributable to the error." *State v. McCray,* 753 N.W.2d 746, 751 (Minn.2008) (citation omitted) (internal quotation marks omitted).

 It is "highly improper" for a prosecutor to shift the burden of proof to the defendant during closing arguments. *McDaniel,* 777 N.W.2d at 750 (citation omitted) (internal quotation marks omitted). A prosecutor improperly shifts the burden of proof when she implies "that a defendant has the burden of proving his innocence." *Id.* (citation omitted) (internal quotation marks omitted). But "a prosecutor's comment on the lack of evidence supporting a defense theory does not improperly shift the burden." *Id.* Further, "corrective instructions by the court can cure prosecutorial error." *Id.*

Nissalke contends that the State shifted the burden of proof to him when the State argued in closing:

> There wasn't anybody there at that party who testified or could testify that they were there with the defendant the entire night, they know for sure he never left the party, he was right by their side the whole time. What was the testimony that you heard? "I don't remember." "I can't say that anybody did leave the party." But no testimony that for sure nobody left the party except—

Defense counsel objected on the basis of burden-shifting, and the district court instructed the State, "Be cautious." The State also said in its closing, without objection, that "there's nobody who can really provide an alibi for the defendant" and that "[t]here's nobody who was at that party who can say he wasn't there or that he was there."

In Nissalke's closing argument, he argued that "the only other testimony saying that … Mr. Nissalke[ ] may have left the party comes from [R.B.]," and proceeded

to discredit that testimony. To discredit the testimony of the State's witnesses, Nissalke referenced multiple times in his closing the $50,000 reward offered to witnesses who came forward. In fact, Nissalke said: "[Y]ou can tell [the State's witnesses have] been fed information, because remember what they all said? 'I want Ms. Senenfelder's children to have it.' You know, that sounds great. Sounds very sweet. . . ."

Nissalke also argued in closing that Agent Burggraf:

> sat down with about 12 of these three-ring binders about 3 or 4 inches thick and went through it. And she tried to develop a theory, and they came up with one.
>
> And there was so much pressure to try to solve this crime that they developed this theory, and they wanted to prove that it was true. They then got the belief in their minds that that's what happened. All they needed to do was develop the facts and evidence to support it.

In the State's rebuttal, the State said in response, "[t]here's no evidence … that any witness was coached at all in any respect, let alone with respect to, [h]ere's what you say about the reward money." The State also said:

> Same thing with this pressure on the police. He created this image of Agent Burggraf poring through 12 binders because she was feeling a lot of pressure to solve this case. Did he ask her that when he had a chance, when he had her on the stand? Tell us about the pressure you were feeling—

Nissalke objected, and the district court told the State to "[b]e cautious" and instructed the State not to "switch the burden of proof."

The State's comments were not attempts to shift the burden of proof. Instead, these comments argued that there was an absence of evidence to support theories that Nissalke put before the jury. These comments therefore did not constitute prosecutorial misconduct of any type. *See McDaniel,* 777 N.W.2d at 750 (concluding that "a prosecutor's comment on the lack of evidence supporting a defense theory does not improperly shift the burden"). And we therefore hold that the State did not commit misconduct in making these comments.

In sum, we hold that Nissalke's claims of prosecutorial misconduct do not entitle him to a new trial.

### IV.

■■■ We turn next to Nissalke's claim that he was denied a fair trial because the district court failed to strike certain jurors for cause. Nissalke points to a potential juror who put in his questionnaire that he "would favor the testimony of a police officer over a non-police officer." The juror explained that he would probably "give the cops a lot of leeway" unless instructed to do otherwise by the court. He confirmed that he wrote in his questionnaire, "I sympathize with law enforcement" as a reason why he thought he might not be able to be impartial in the case. The juror also stated that he believed that a non-police officer would be more likely to lie on the stand than a police officer, that "most of [his] close friends are related to law enforcement in some way," and that he did not know if he had "the ability to be fair," but that he would "try to" treat other testimony similar to the testimony of a police officer. The juror also indicated that he was concerned about how his relationship with police officers might impact his ability to presume Nissalke innocent until proven guilty. Nissalke moved to

strike the juror for cause, the district court denied the motion, and Nissalke then exercised a peremptory strike and removed the juror from the panel.

At that point, two jurors had been seated and Nissalke was left with eleven peremptory strikes. Nissalke used his final peremptory strike to remove an additional juror much later in the process. Nissalke made one more challenge for cause before the jury was empanelled, and the district court granted the challenge and excused that juror.

■■■ On review, we "give deference to the district court's ruling on challenges for cause because the district court is in the best position to observe and judge the demeanor of the prospective juror." *State v. Prtine,* 784 N.W.2d 303, 310 (Minn.2010) (citations omitted) (internal quotation marks omitted). In *Prtine,* we said that if a potential juror expresses that he or she would give "special credence" to the testimony of law enforcement officers, the district court must either excuse the juror for cause, or "by instructions and additional questions," convince the juror that there "is no special credence due to the testimony of [police] officers." *Id.* (alteration in original) (citations omitted) (internal quotation marks omitted). Then, if the juror "states unequivocally that he or she will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence," the prospective juror may be rehabilitated. *Id.* We emphasized that "while the district court has considerable discretion in ruling on challenges for cause," a juror who expresses that he is inclined to view the testimony of a police officer more favorably than other witnesses must "swear that he [can] set aside any opinion he might hold and decide the case on the evidence," or be removed from the panel. *Id.* at 311 (cita-

tion omitted) (internal quotation marks omitted).

The record reveals that the juror was unable to state unequivocally that he could be unbiased and put his favoritism for police officers aside to presume Nissalke innocent until proven guilty. The district court therefore erred by failing to remove the challenged juror for cause. *See id.* at 310. But this error does not require reversal because Nissalke exercised a peremptory strike to remove the biased juror. A district court's erroneous "failure to dismiss a juror for cause" is "cured by the defendant's exercise of a peremptory challenge to remove the juror." *Id.* at 311. And Nissalke's implication that he was denied "the full complement of his preemptory strikes" and therefore was denied a fair trial is without merit because Nissalke had strikes remaining after he used a peremptory strike to remove the challenged juror and no more challenges for cause were denied after that point. *See id.* at 310–11. Therefore, even though the district court erred by failing to remove a biased juror for cause, we hold that this error does not require reversal.[11]

### V.

We turn next to Nissalke's claim that the evidence was not sufficient to support his conviction for premeditated first-degree murder. When assessing whether the evidence is sufficient to support a conviction, we conduct "a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *Staunton v. State,* 784 N.W.2d 289, 297 (Minn.2010) (citation omitted) (internal quotation marks omitted). But we will not disturb a guilty verdict "if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [a] defendant was proven guilty of the offense charged." *Staunton,* 784 N.W.2d at 297 (alteration in original) (citation omitted) (internal quotation marks omitted). We "construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn.2008).

Nissalke was convicted and sentenced for premeditated first-degree murder, in violation of Minn.Stat. § 609.185(a)(1). This statute provides that whoever "causes the death of a human being with premeditation and with intent to effect the death of the person or of another[,]" is "guilty of murder in the first degree." Minn.Stat. § 609.185(a)(1). Our careful review of the record convinces us that the evidence was sufficient to sustain the conviction.

The State presented evidence that Nissalke and Erickson worked to get Senenfelder to recant her statement that resulted in their mutual friend James Bolstad being in jail. The evidence showed that Nissalke threatened Senenfelder with death if she did not recant. The State presented evidence that the night of Sen-

---

11. During voir dire, another potential juror affirmed that she had "the idea that Mr. Nissalke is guilty," that her "trust and faith" in police officers led her to believe that a charged defendant would be guilty of the crime, even before hearing the evidence. The juror also appears to have equivocated when asked if she would presume Nissalke innocent before hearing any evidence. Nissalke moved to strike the juror for cause, and he contends on appeal that the district court erred in refusing to strike the juror. This contention is without merit because this juror was, in fact, removed for cause.

enfelder's murder, when Erickson found out that their plan to get Bolstad out of jail was not successful, Erickson offered to pay Nissalke to kill Senenfelder. Witnesses testified that Nissalke wanted to know how much Erickson would pay. The State also presented testimony that Nissalke and Erickson left the party the night of the murder saying, "kill the bitch."

The evidence showed that Nissalke later admitted that Erickson paid him to kill Senenfelder. And there was testimony that Nissalke did not have a lot of money before the murder but was seen with "a wad" of money afterward.

The State presented testimony that Nissalke had a large cut on his hand the night of the murder, was looking for a lost knife that he carried all the time and was carrying the night of the murder, and worked with others to clean up Erickson's apartment and to throw away bags of clothes and other items the morning after the murder.

Witnesses for the State testified that Nissalke and Erickson held a meeting with witnesses to "get their stories straight" the day after the murder. Witnesses testified that Nissalke told everyone to tell police that no one left the party the night of the murder. Testimony revealed Nissalke threatened to kill anyone who told the truth by stabbing them in the heart, like he killed Senenfelder, 3 days before that detail was released to the public. The State presented evidence that Nissalke confessed to killing Senenfelder to many witnesses on many occasions—to J.B., to D.C., to R.B., to S.S., to J.N., and to K.B.

Finally, the State presented physical evidence showing that Nissalke's DNA was on cigarette butts in Senenfelder's apartment and Nissalke could not be excluded as a contributor to DNA evidence recovered on a red blanket in Senenfelder's apartment and on the blue bedspread where the body was found. The State also presented expert testimony that established that a knife of the type that Nissalke carried and lost the night of the party could have inflicted some of the wounds to Senenfelder's body.

This evidence is not purely circumstantial, is not based on speculation and conjecture, and is sufficient to allow a jury to find that Nissalke, while acting with premeditation, intentionally caused the death of Ada Senenfelder. *See* Minn.Stat. § 609.185(a)(1). Nissalke did present evidence impeaching the credibility of the State's witnesses and their account of the facts, including evidence that some of the State's witnesses had lied to the police when they were questioned in 1985 and that witnesses were offered a $50,000 reward for providing useful information. But we assume that the jury chose to disbelieve any evidence inconsistent with the verdict. *See Tscheu,* 758 N.W.2d at 858. In sum, after careful review of the record, we hold that the evidence was sufficient to support Nissalke's conviction.

## VI.

We turn next to Nissalke's claim that the State violated his right to due process because the State failed to adequately preserve potentially exculpatory blood evidence found at the scene. Before opening statements, the court held a *Frye–Mack* hearing to determine "whether the laboratory which did the [DNA] testing was in compliance with the appropriate standards and controls." The court found that the State had "met its burden." Then, during the cross-examination of BCA Agent Dan Bergman on June 12, 2009, Nissalke asked Agent Bergman about items 8, 9, 10, 11, and 12 collected at the scene of the murder. Agent Bergman testified that in 2005, he went to retrieve items 8–12 for DNA analysis. But when

Agent Bergman looked for the items, he could not find them.

Nissalke elicited testimony from Agent Bergman that the missing items were blood samples obtained on or near the front door of Ada's apartment. Agent Bergman could not explain why the items were missing and did not have any documentation explaining why the boxes that had contained the evidence were empty. Agent Bergman testified that he assumed that the samples were used up in analysis, but that he did not know for sure. Agent Bergman also testified on redirect that if he had the opportunity to examine the boxes, he would know for certain whether he put the boxes back empty after consuming the samples.

The record indicates that the district court then gave the State leave to allow Agent Bergman to examine the empty boxes. But when Agent Bergman returned on redirect later that day, he was unable to explain why the boxes were empty or whether the items were used up in testing. Agent Bergman testified, however, that the lack of documentation was not unusual given the protocols in place in 1985.

 The State has a duty to preserve evidence that it collects during the investigation of a crime. *State v. Krosch,* 642 N.W.2d 713, 718 (Minn.2002). When the State "loses, destroys, or otherwise fails to preserve material evidence," a defendant's due process rights are implicated. *State v. Jenkins,* 782 N.W.2d 211, 235 (Minn.2010) (citing *Arizona v. Youngblood,* 488 U.S. 51, 56–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 486–91, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). But the "failure to preserve potentially useful evidence that is

actually collected during a criminal investigation does not constitute a denial of due process unless the defendant shows bad faith on the part of the police." *Id.* (citing *Illinois v. Fisher,* 540 U.S. 544, 547–48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004); *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333).

 In order to assess Nissalke's claim, we therefore "consider whether the destruction was intentional and whether the exculpatory value of the lost or destroyed evidence was apparent and material." *Id.* If we conclude that the evidence was "destroyed as a result of intentional conduct," we consider "whether there is any evidence that the State destroyed or released the evidence to avoid discovery of evidence beneficial to the defense." *Id.* (citation omitted) (internal quotation marks omitted).

Nissalke has not alleged, nor has he shown, that the evidence was lost as a result of bad faith on the part of the State. Specifically, Nissalke has not shown that the evidence was intentionally destroyed or how the lost evidence would have exculpated him. Moreover, the record reflects that the State followed the protocols in effect at the time while handling the physical evidence. We therefore hold that the State did not violate Nissalke's right to due process.

## VII.

We turn next to Nissalke's claim that he was denied effective assistance of counsel at trial. Nissalke claims that his counsel conducted a "half hearted investigation," failed to put an adequate number of witnesses on the stand, "elicited damaging testimony on several occasions," was impaired by his arrest for possession of cocaine during trial preparations,[12] "failed to

---

12. On January 16, 2009, Nissalke's counsel, Charles A. Ramsey, was arrested for felony possession of cocaine in the Winona County Courthouse while counsel was representing

follow [Nissalke's] wishes on many circumstances," and failed to file a spoliation motion after discovering that the State had lost physical evidence.

■ The Sixth Amendment guarantees a defendant the effective assistance of counsel. *State v. Wright*, 719 N.W.2d 910, 919 (Minn.2006) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). To demonstrate that he did not receive effective assistance of counsel, Nissalke "must show that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that, but for his counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Yang*, 774 N.W.2d 539, 564–65 (Minn.2009); *see also Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We "need not address both the performance and prejudice prongs if one is determinative." *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003).

■■ As for the first prong, objective reasonableness requires an attorney to exercise "the customary skills and diligence that a reasonably competent attorney would [exercise] under the circumstances." *State v. Miller*, 754 N.W.2d 686, 709 (Minn.2008) (alternation in original) (citation omitted) (internal quotation marks omitted). But decisions to present certain evidence and call certain witnesses at trial "are tactical decisions properly left to the discretion of trial counsel," and such decisions do not prove that counsel's performance fell below an objective standard of reasonableness. *State v. Mems*, 708 N.W.2d 526, 534 (Minn.2006); *see also*

*State v. Blom*, 682 N.W.2d 578, 624 (Minn. 2004); *State v. Brocks*, 587 N.W.2d 37, 43 (Minn.1998).

■ Under the second prong, "the defendant must show that counsel's errors 'actually' had an adverse effect in that but for the errors the result of the proceeding probably would have been different." *Gates v. State*, 398 N.W.2d 558, 562 (Minn. 1987) (citing *Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052). This "analysis of prejudice must be made in the context of the totality of the evidence before the factfinder." *Id.* at 563.

■ Some of Nissalke's claims of ineffectiveness—including his counsel's decision to call few witnesses, the depth of his counsel's investigation, his counsel's decision to obtain the grand jury transcripts at a certain time, and his counsel's decision not to file a spoliation motion due to the lost physical evidence—fall squarely within "tactical decisions properly left to the discretion of trial counsel." *Mems*, 708 N.W.2d at 534; *see also Sanchez–Diaz v. State*, 758 N.W.2d 843, 848 (Minn.2008) (stating that trial strategy "includes the extent of counsel's investigation"). As to Nissalke's claims of ineffectiveness based on counsel's drug arrest several months before trial and counsel's failure to follow Nissalke's wishes, Nissalke does not articulate with any specificity how this conduct manifested objectively unreasonable performance. The record instead reflects that counsel tested every witness, made numerous motions and objections, challenged the State's evidence at every turn, and made meticulous arguments to support his motions during trial.[13] We there-

Nissalke on another matter. The district court advised Nissalke of his counsel's arrest at the omnibus hearing for this case on February 23, 2009, and Nissalke confirmed that he wished to retain his counsel for the murder trial.

13. By our count, Nissalke filed fifteen separate pretrial motions, dozens of additional motions in limine, and numerous support, reply, and opposition memoranda.

fore hold that as to these claims, Nissalke has not demonstrated that his counsel's performance was objectively unreasonable.

■ But Nissalke's claim that his counsel was ineffective because counsel elicited unfavorable testimony requires further examination. This claim relates to counsel's hesitation to play a tape that referred to a State's witness taking a lie detector test. During cross-examination of one of the State's witnesses, Nissalke's counsel played audio tapes of R.B.'s interviews with the police. The tapes were played in an effort to impeach R.B.'s credibility because she gave statements during the interview that Nissalke contended conflicted with her trial testimony. During the playing of the tape, the jury heard that certain individuals had refused to take a lie detector test, but that R.B. had taken one.

The State objected and the district court called a recess. Nissalke's counsel told the court after the jury had been excused that playing the part of the tape discussing the lie detector test had been a "mistake" for which he had no justification. The court asked the State if it wanted to seek a mistrial. The State equivocated, but ultimately indicated that it would not seek a mistrial. The court decided that it was "not going to declare a mistrial at this point," but would instead give a limiting instruction to the jury. Nissalke was later consulted outside the presence of the jury on whether he wished to request a mistrial based on the inadvertent lie detector testimony. Nissalke stated that he wished "to continue on with the trial."

Nissalke argues that his counsel's performance in allowing the lie detector evidence to come before the jury was objectively unreasonable. We need not resolve that question because even if counsel's performance was objectively unreasonable as to this issue, Nissalke cannot prevail on his claim unless he can demonstrate that the error was prejudicial. *See Gates*, 398 N.W.2d at 562. When viewed in the "context of the totality of the evidence," the inadvertent slip of a few seconds of audiotape in a month-long trial was unlikely to impact the ultimate outcome of the case. *Id.* at 563. And, as discussed above, the State's evidence against Nissalke was strong. The State presented multiple witnesses who testified to Nissalke's confessions, premeditation, motive, and other corroborating details. The State also had DNA and other physical evidence that connected Nissalke to the crime. In this context, it is unlikely the jury would have reached a different result without the lie detector evidence. Because Nissalke has not demonstrated that he was prejudiced by the lie detector evidence, we hold that he is not entitled to a new trial based on his claims of ineffective assistance of counsel.

Affirmed.

PAGE, Justice (dissenting).

The court goes to great lengths to explain why the rule we set out in *State v. Mims* does not entitle Nissalke to a new trial. But to paraphrase Queen Gertrude in Shakespeare's *Hamlet*, the court "doth protest too much, methinks." *See* William Shakespeare, *Hamlet* act 3, sc. 2 ("The lady doth protest too much, methinks."). In *Mims*, we set forth the rule "that in any criminal case any communication relating to the case occurring during a judge's uninvited entry into the jury room during deliberations and in the absence of defendant and counsel constitutes reversible error." 306 Minn. 159, 165, 235 N.W.2d 381, 386 (1975). In *Mims*, we explained the rationale for this rule as follows:

But a judge of the court occupies a different attitude toward the jury from that of any other person. In the heat and passion often engendered on the trial, in the conflicting arguments and statement of law by opposing counsel, the jury naturally looks to the court to bring certainty out of the confusion. An act, a sentence, or a word from the presiding judge may exert a controlling influence on the verdict. It is for these reasons that a communication by the judge to the jury stands on a different basis from that of another person, and for a like reason the law should throw a higher degree of circumspection around such communications.... [O]wing to his superior influence, he should make no communication to the jury, except in open court, in the presence of the parties or their counsel, or after a full opportunity has been given them to be present.

*Id.* at 166, 235 N.W.2d at 386 (alterations omitted) (quoting *Danes v. Pearson*, 6 Ind. App. 465, 33 N.E. 976, 978 (1893) (internal quotation marks omitted)). The record before us indicates that the trial judge in this case entered the jury room uninvited and communicated with the jury in the absence of the defendant and his counsel after the jury had begun deliberating. Thus, I conclude that *Mims* applies.

The court concludes that *Mims* does not apply because the jury had not begun deliberations at the time the trial judge entered the jury room. The record belies that conclusion. Although the court concedes that the court minutes indicate that the jury's deliberations began *before* the trial judge entered the jury room, the court contends that the "first indication in the transcript" that deliberations had begun was after the trial judge swore in the jury attendants, which occurred after the trial judge had entered the jury room. Given the court minutes, this contention is obviously inconsistent with the record. Moreover, the reference in the transcript—"Jury Out for Deliberations"—is a statement of what the jury was doing at the time and not a statement about when such conduct began.

The contention that deliberations had not yet begun is also problematic for other reasons. As Nissalke points out, there is no evidence in the record to establish that the jury was ever aware of when the jury attendants were sworn, and therefore there is no basis for the court to conclude that the jury waited until after the attendants were sworn to begin deliberations. After completing the instructions, the trial judge told the jury:

> From this point on when the bailiffs are sworn and the jury attendants are sworn and you get into the jury room, you can at long last talk to each other about the case, which you haven't been able to do for some weeks, so please do that.

The transcript indicates that shortly after this statement, the bailiffs were sworn and the jury exited the courtroom. It appears from the available record that the attendants were sworn outside of the jury's presence sometime after the judge entered the jury room, answered the jury's questions, and returned to the courtroom. It also appears that the jurors were never informed that the jury attendants' swearing-in had taken place. Because this sequence of events suggests that the jurors were unaware of when the jury attendants were sworn, the fact that the jury attendants were sworn after the trial judge had entered and left the jury room sheds no light on when the jury began its deliberations. Rather, the transcript supports an inference that the jury began deliberations as soon as it left the courtroom and entered the jury room.

In addition, a reasonable inference to be drawn from the fact that jurors asked the judge two questions while the judge was in the jury room is that the jury had already begun deliberations. Although the court characterizes the questions asked as "generic and not about specific pieces of evidence," the questions were not generic. The questions concerned the jury's ability to get a videotape of witnesses' testimony as well as the official transcript or a copy of the official transcript. These questions are typical of questions asked by deliberating juries. *See, e.g., State v. Haynes,* 725 N.W.2d 524, 528–29 (Minn.2007) (jury's request during deliberations to replay witness's taped statement); *State v. Ming Sen Shiue,* 326 N.W.2d 648, 653 (Minn. 1982) (jury's request during deliberations to review videotapes that were admitted as evidence during trial); *State v. Schluter,* 281 N.W.2d 174, 177 (Minn.1979) (jury's request during deliberations for transcript of testimony of three witnesses); *State v. Scott,* 277 N.W.2d 659, 660 (Minn.1979) (jury's request during deliberations to have court reporter reread entire trial testimony of chief prosecution witness and defendant).[1]

Interestingly, in reaching the conclusion that there was no *Mims* violation, the court engages in an extended discussion about why Nissalke was not prejudiced by the trial judge's entry into the jury room.

For example, the court suggests that, because the jurors were expecting the trial judge to provide them with the corrected verdict forms and trial exhibits and because it had been a brief time since the jurors had departed the courtroom, the trial judge's entry into the jury room did not "undermine the independence of the jury's final, collective, decisional process." *Supra* at 97. The court also notes that other concerns discussed in *Mims*—i.e., that "the adversarial process be protected" and the "defendant's right to be present,"—are not implicated in this case because defense counsel declined the trial judge's offer to bring the jurors back into court for a reading of the corrected verdict forms and because neither counsel objected when the trial judge informed the parties of his intent to walk into the jury room to deliver the corrected verdict forms.

. But the court's extended discussions miss the point because they provide no insight into whether jury deliberations began before or after the trial judge entered the jury room. More importantly, in *Mims* we expressly rejected the idea that a defendant must show some prejudice in order for a new trial to be granted. *See* 306 Minn. at 165, 170, 235 N.W.2d at 386, 388. Based on the bright-line rule provided in *Mims,* if deliberations commenced

---

1. The court states that:
 The flaw in this argument is revealed by the fact that if a juror asked during voir dire (or even as the jury is being led out of the courtroom to the jury room) whether a transcript would be available for review, no one would seriously contend that the question demonstrated that the jurors were deliberating.
 The court is correct that under either of its hypothetical sets of facts no one could seriously contend that the question demonstrated that the jurors were deliberating. But neither of those circumstances is present in this case. More importantly, neither circumstance involves the judge invading the sanctity of the jury room and therefore no *Mims* violation would exist. Indeed, with respect to the court's voir dire hypothetical, I would note that voir dire takes place in open court with the defendant and both counsel present. Here, the jurors asked the trial judge the questions while they were in the jury room— the room in which they had been told that they could "at long last talk to each other about the case." Therefore, any argument about juror questions asked outside the jury room is not relevant to the circumstances of this case.

before the judge entered the jury room, Nissalke would be entitled to an automatic reversal and a new trial, and, if deliberations had not begun, there would be no violation of, and no reversal required, by *Mims*. Either way, the extended discussion of prejudice is unnecessary.

The court argues that this analysis "ignores the importance that the 'uninvited entry' played in our adoption of the strict *Mims* rule" and that "the dissent asserts that we should extend the strict *Mims* rule to the expected entry in this case." The court's argument assumes that there is a distinction between "uninvited entries" and "expected entries" even though this court has never made such a distinction in applying *Mims*. In any case, the distinction is one without a difference. The purpose of *Mims* is to preclude judicial intrusion into the deliberative process, whether it is invited or expected. The immeasurable influence of the judge on the jury during the deliberation process does not vanish simply because the jury expected the judge's entry. Further, the notion that a judge could immunize his or her entry into the jury room when jurors are deliberating by informing the jury in advance that the judge would enter the jury room, thus making the entry "expected," turns our *Mims* decision on its head.

The position taken by the court also fails for a more fundamental reason. There is simply nothing in the record to support the court's contention that the trial judge's entry in this case was invited or expected by the jurors. After noting several errors on the verdict forms, the trial judge told the jury:

> Jurors, I have to—I can either call you back and reread those, but I think I'll read them in the record. I have to make some corrections that I missed and shouldn't have missed, but I did. I'm going to correct those. And so that

the verdict forms that go into the jury room with you, you can rest assured will be accurate and reflect the law and the charges which are contained.

> With you going into the jury room will also be all of the evidence that's been received by the Court, a stack of it.... We will see that those are brought in to you.

After that announcement was made, the alternate jurors were released, the bailiffs were sworn, and the jurors left the courtroom. At no time, either before or after they left the courtroom, did the jurors invite the trial judge into the jury room, nor did the trial judge indicate to the jury that he would personally deliver the corrected instructions to the jury room. After the jurors left the courtroom, Nissalke's counsel, along with the prosecutor, consented on the record to the court reading the corrected instructions into the record without bringing the jury back into the courtroom. At the end of the discussion involving the corrected jury instructions, the trial judge informed counsel, "I'll walk in with the clerk so that we can deliver this otherwise; we're in recess."

Assuming, for purposes of the discussion only, that the trial judge being invited or expected to enter into the jury room is a relevant consideration, the court's argument still fails on this record because it is clear that the judge was not invited into the jury room. To the extent that the court is suggesting that the trial judge, having informed counsel that he would be entering the jury room to deliver corrected verdict forms constitutes an invitation, it is enough to say that even if the word "invitation" could be stretched to include that circumstance, a judge's self-invitation does not mitigate the problems that *Mims* is intended to eliminate. If anything, a judge's self-invitation may exacerbate those problems.

It is also clear that the jury had no reason to expect the trial judge to enter the jury room. The record establishes that the trial judge informed the jury that the corrected verdict forms would be delivered to them, but made no mention of who would be delivering the corrected forms. The record further establishes that after the jury had left the courtroom, the trial judge informed counsel and the defendant of his intent to deliver the corrected forms. That counsel and the defendant had reason to expect that the trial judge would enter the jury room after deliberations began does not mean that the jury had the same expectation. And, in the context of the concerns raised in *Mims*, it is the jury's expectation that is relevant. No such expectation can be established on this record.

In this case, the trial judge not only delivered the verdict forms and evidence to the jury room, he also answered the jurors' questions. As highlighted by the cases cited above, *supra* at 113–14, a judge does not have the authority to respond to a jury's question or request without bringing the jury back into the courtroom in the defendant's presence. Minn. R.Crim. P. 26.03, subd. 1(1)(f). In addition, the trial judge's response to the jurors' questions in this case was outside the scope of the agreement between counsel and the court. After the jury left the courtroom, the trial judge stated that he would correct the verdict forms, and then further stated:

> I'm going to read both of them into the record, unless you wish me to bring the jury back in merely to read it to them?
> Mr. Gort: No, Your Honor.
> The Court: Okay. Mr. Ramsay, do you wish me to bring the jury in to reread that to them?
> Mr. Ramsay: No, Your Honor. That's not necessary.

The trial judge then proceeded to deliver the exhibits and instructions to the jury and, while in the jury room, answered two juror questions.

The court points out that Nissalke failed to demonstrate that "the record does not accurately reflect what transpired in the jury room" and states that it is bound by *State v. Martin*, 723 N.W.2d 613 (Minn. 2006). *Supra* at 98 n. 7. But as the record indicates, both counsel agreed to forego the option to bring the jury back into the courtroom to read the corrected verdict forms, but mentioned nothing about the trial judge answering juror questions. Therefore, the trial judge's answering of juror questions satisfies Nissalke's burden under *Martin* to produce "evidence suggesting contact with the jury outside the scope of the agreement" reached between counsel and the court. *See* 723 N.W.2d at 624.

Finally, I am compelled to make three other observations. The first observation is that the court makes a point of the fact that in *Mims*, the jury had been deliberating for approximately 4 hours before the judge made the uninvited entry into the jury room while, in this case, the trial judge entered the jury room "only a few minutes after the jury left the courtroom." I fail to see what difference the disparity in time makes. The problems that *Mims* is designed to avoid do not go away simply because the judge's intrusion into the jury room occurs shortly after deliberations begin.

The second observation is that the problem here does not lie in the fact that the corrected verdict forms were delivered to the jury; the problem is that the trial judge was the person who delivered them. In *Mims*, we noted that "the trial judge's position in performing his role and function before submission of the case is a powerful one and makes him an imposing figure in the minds of the jurors." 306

Minn. at 168, 235 N.W.2d at 387. Accordingly, we stated that:

> In view of the judge's dominant role during earlier stages of the trial, an uninvited entrance into the sanctity of the jury room for any purpose offends the integrity of the proceedings and risks influencing the jury's decisional process in some degree, however difficult to define or impossible to measure.... When such an intrusion occurs, we believe there is a significant interference with the orderly decisional process, and prejudice to the process results by the implication that the judge has the prerogative of entering the jury room and there exercising the same dominant authority he possesses in the courtroom.... A strict rule prohibiting such intrusions has the salutary effect of minimizing the interruptions of the jury during deliberations, eliminating the necessity of determining the existence of actual prejudice and, hopefully, discouraging repetition of the intrusions.

*Id.* at 169–70, 235 N.W.2d at 388.

Here, the trial judge's intrusion into the sanctity of the jury room offended "the integrity of the proceedings and risk[ed] influencing the jury's decisional process in some degree, however difficult to define or impossible to measure." *See id.* at 169, 235 N.W.2d at 388.

The third observation is that the *Mims* rule is clear, longstanding, and effective: "owing to [the judge's] superior influence, he should make no communication to the jury, except in open court, in the presence of the parties or their counsel, or after a full opportunity has been given them to be present." *Mims*, 306 Minn. at 166, 235 N.W.2d at 386 (citing *Danes*, 33 N.E. at 978 (internal quotation marks omitted)). In this case, that rule was violated. Therefore, I respectfully dissent.

PAUL H. ANDERSON, Justice (dissenting).

I join in the dissent of Justice Page.

MEYER, Justice (dissenting).

I join in the dissent of Justice Page.